1  JEREMY J. GRAY (SBN 150075)
     *jgray@zuberlaw.com*
2  JEFFREY J. ZUBER (SBN 220830)
     *jzuber@zuberlaw.com*
3  ZUBER LAWLER & DEL DUCA LLP
   777 S. Figueroa Street, 37th Floor
4  Los Angeles, California 90017   USA
   Telephone: (213) 596-5620
5  Facsimile: (213) 596-5621

6  Attorneys for Plaintiffs
   Haley Videckis and Layana White

7

8            UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11  | HALEY VIDECKIS and LAYANA WHITE, individuals, | CASE NO. 2:15-CV-00298-DDP (JCx) |
    |---|---|
12  | | **SECOND AMENDED COMPLAINT FOR DAMAGES:** |
13  | Plaintiffs, | |
    | v. | **1. VIOLATION OF RIGHT OF PRIVACY UNDER CALIFORNIA CONSTITUTION ARTICLE 1, § 1;** |
14  | PEPPERDINE UNIVERSITY, a corporation doing business in California, | |
15  | | **2. VIOLATION OF CALIFORNIA EDUCATIONAL CODE §§ 220, 66251, 66270;** |
16  | Defendant. | |
17  | | **3. VIOLATION OF TITLE IX – Deliberate Indifference;** |
18  | | |
19  | | **4. VIOLATION OF TITLE IX – Intentional Discrimination; AND** |
20  | | |
21  | | **5. VIOLATION OF TITLE IX – Retaliation for Complaints About Discrimination** |

22

23

24

25

26

27

28

2079-1002 / 411332.3

## I.

## PARTIES

1.     Plaintiff HALEY VIDECKIS ("Haley") is a resident of California and a 20-year-old Caucasian woman, who played basketball at Pepperdine University. She is a transfer student from Arizona State University.  She was one of the outstanding players at Arizona State University and earned a PAC 12 All-Freshman honorable mention notice during the 2012-2013 season.  In July 2013, she was highly recruited by Pepperdine University ("Pepperdine" or the "University") and its coaches and transferred to the University to seek better education and further her career to become a WNBA basketball player.

2.     Plaintiff LAYANA WHITE ("Layana") is a resident of California and a 21-year-old African American woman, who played basketball at Pepperdine.  She was a transfer student from University of Arizona where she played basketball as one of its top players.  She was highly recruited by the University and its coaches and transferred to Pepperdine in January 2014.  She believed that transferring to Pepperdine University would provide her better education and further her career to become a WNBA player.

3.     Defendant PEPPERDINE UNIVERSITY is a university located in California and is a corporation.  The University and its students receive funds from the federal government and the State of California.

## II.

## JURISDICTION AND VENUE

4.     This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. Section 1331 because three of Plaintiffs' claims arise under Title IX of the United States Education Amendments of 1972, 20 U.S.C. Sections 1681-1688 (hereinafter "Title IX").  In addition, pursuant to 28 U.S.C. Section 1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims.

5.     This Court has personal jurisdiction over Pepperdine because it is

1   authorized to do business and conducts business in the State of California in that it
2   maintains its principal campus in Malibu, California in Los Angeles County.
3        6.    Venue is proper in this District pursuant to 28 U.S.C. Sections 1391(a)
4   & (b), because Defendant resides in this District and a substantial part of the events
5   or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

6                                    **III.**
7                              **NON PARTIES**

8        7.    RYAN WEISENBERG ("Coach Ryan") is the head coach of the
9   women's basketball team at Pepperdine and acted within the scope and course of his
10  employment at all times mentioned herein. Coach Ryan is a managing agent of the
11  University in regards to the decisions as to which of the students will be members of
12  the basketball team, under what conditions they may play and their code of conduct.
13  Coach Ryan directed, encouraged, approved, knew and failed to correct and stop the
14  alleged conduct of his assistant coaches, athletic trainers and academic coordinator
15  which are part of Plaintiffs' cause of actions against Defendant Pepperdine.

16       8.    JORDAN SMITH ("Coach Jordan") is an assistant coach of the
17  women's basketball team at Pepperdine, reports to Coach Ryan and acted within the
18  scope and course of her employment at all times mentioned herein.

19       9.    MALLORIE WINN ("Coach Mallorie") is an assistant coach of the
20  women's basketball team at Pepperdine University, reports to Coach Ryan and acted
21  within the scope and course of her employment at all times mentioned herein.

22       10.   TRISHA RANIEWICZ ("Coach Trisha") is an assistant coach of the
23  women's basketball team at Pepperdine University, reports to Coach Ryan and acted
24  within the scope and course of her employment at all times mentioned herein.

25       11.   KEVIN WRIGHT ("Kevin") is the head athletic trainer of the women's
26  basketball team at Pepperdine University, reports to Coach Ryan and acted within
27  the scope and course of his employment at all times mentioned herein.

28       12.   KARISSA SCHERER ("Karissa") is an assistant athletic trainer of the

1  women's basketball team at Pepperdine University, reports to Coach Ryan and acted
2  within the scope and course of her employment at all times mentioned herein.

3      13.   ADI CONLOGUE ("Adi") is an athletic academic coordinator of the
4  women's basketball team at Pepperdine University, works in junction with Coach
5  Ryan and acted within the scope and course of her employment at all times
6  mentioned herein.

7      14.   DR. STEVE POTTS ("Dr. Potts") is the Athletic Director at
8  Pepperdine University, a supervisor of Coach Ryan and acted within the scope and
9  course of his employment at all times mentioned herein.  Dr. Potts is a managing
10  agent of the University in regards to all athletic teams including the women's
11  basketball team, under what conditions they may play and their code of conduct.

12      15.   TABATHA JONES JOLIVET ("Title IX coordinator") is a Title IX
13  Deputy Coordinator at Pepperdine University and reports to President Benton and
14  acted within the scope and course of her employment at all times mentioned herein.
15  She is a managing agent of the University in regards to the University's compliance
16  with Title IX.

17      16.   ANDREW BENTON ("President Benton") is the president and a
18  managing agent at Pepperdine University at all times mentioned herein.

19                              **IV.**
20                    **SUMMARY OF THE CASE**

21      17.   In the spring of 2014, Coach Ryan came to the conclusion that two of
22  the players on his basketball team were lesbians and were having a lesbian
23  relationship. The two basketball players were Plaintiffs, Haley and Layana.  Coach
24  Ryan asserted that their lesbian relationship would cause turmoil within the team
25  and a losing season.  Consistent with these assertions, Coach Ryan deliberately
26  invaded Plaintiffs' privacy, harassed Plaintiffs and discriminated against Plaintiffs
27  based on their sexual orientation, in an effort to get them to quit.  In this way,
28  Plaintiffs' scholarships would be available for recruiting replacement players.  In

1  order to accomplish his goal, he was aided by his assistant coaches, trainers and
2  academic coordinator.

3      18.    By September 2014, Coach Ryan was so successful in his endeavor that
4  Layana attempted to commit suicide and Haley was medically disqualified by the
5  trainers despite a doctor's diagnosis to the contrary.  Plaintiffs complained to the
6  athletic director and to the Title IX coordinator as to the above.  However, the
7  University officials were deliberately indifferent and refused to take actions to stop
8  the intrusion, harassment and discrimination.  Instead, the Title IX coordinator
9  issued a cover up report.  In December 2014, because of the university's deliberate
10 indifference to the invasion of privacy, harassment and discrimination based on
11 sexual orientation, Plaintiffs resigned from the University.

12     19.    The University's treatment of Plaintiffs and their perceived and/or
13 actual sexual orientation and/or relationship was, in part, motivated and driven by
14 gender stereotypes held by the University, its staff and employees of Plaintiffs as
15 female athletes and specifically women basketball players.  For example, the
16 University and its employees and staff made improper inquiries into the intimate,
17 sexual affairs of the Plaintiffs, as female athletes, which were not, and would not, be
18 made of (or to) their similarly situated male athlete counterparts.  Moreover,
19 Pepperdine, and the Coaches of the Pepperdine women's basketball team, made
20 statements and announced policies, practices and rules relating to sexual orientation
21 (and specifically "lesbianism") during Plaintiffs' tenure there, whereas no similar
22 comments or rules were made regarding sexual orientation for Plaintiffs' male
23 counterparts.  Furthermore, the refusal by the University and its employees and
24 staff, to accept or accede to Plaintiffs' efforts to maintain the confidentiality of their
25 sexual orientation and/or relationship amounted to different treatment than would
26 have been afforded to similar requests by Plaintiffs' male counterparts.

27     20.    In addition, the University, its staff and employees announced, and
28 implemented, treatment for those, like Plaintiffs, who were in same gender

4

1 relationships different than the treatment afforded athletes in opposite gender
2 relationships.

3                                        V.

4                                    **FACTS**

5                              **Inquiries by Adi**

6       21.    In the beginning of February 2014 Academic Coordinator Adi, who
7 was selected by the University to help female basketball players maintain good
8 grades, pulled Haley into her office to talk.  In this meeting, Adi asked Haley if
9 there were any gay or bisexual players on the team.  Haley said no.  Although she
10 was aware of multiple girls on the team that were gay and bisexual, she could not
11 answer this question honestly because Pepperdine is extremely discriminatory
12 against the LGBT (Lesbian, Gay, Bisexual and Transgender) community.
13 Furthermore, Adi asked Haley if she was gay.  Haley said no.  The next week, Adi
14 asked Haley to come into her office.  The following dialogue occurred.

15             Adi: "I noticed that you and Layana have become very close."
16             Haley: "Yeah, Layana and I have become good friends."
17             Adi: "How close?" "Like BFFs [Best Friends Forever] or more than
18             that?"
19             Haley: "We are just friends."

20       22.    In the study hall room, Adi asked Haley what she was doing for spring
21 break.  Haley told her that she was going home to Chicago and that Layana was
22 going to visit Arizona.  Adi said, "You aren't going to take Layana home with you?"
23 Haley said no.  Adi said, "Aren't you going to miss her?"  When Haley and Layana
24 returned from Vegas where they spent their break, Adi continued asking both Haley
25 and Layana about their trip.  These questions include but are not limited to: What
26 did you do?  Where did you sleep?  Did you share a bed?  Layana told Adi that she
27 did not go to Vegas with Haley.  Adi then told Layana that she did not believe
28 Layana and that she knew that Layana was with Haley.  Neither Haley nor Layana

1   admitted to Adi that they went to Vegas together.

2       23.     In March 2014, every time Haley would see Adi, she asked Haley

3   about Layana. Adi, "How are you and Layana?"  She would ask this question in a

4   way suggesting Haley and Layana were in a relationship.  Adi never asked Haley

5   how any of her other teammates were doing.  Adi would ask Haley if she was going

6   places with Layana on the weekends and ask personal questions about what they did

7   together.  On March 18, 2014, Adi asked Haley if Layana bought her anything for

8   her birthday.  When Haley said no, Adi seemed surprised.  She asked if Layana took

9   Haley anywhere for her birthday.  Haley said no. Adi suggested a restaurant that

10  Layana and Haley go together on a date.  Haley told Adi that she wouldn't be going

11  with Layana anywhere on a date.  Haley asked Adi very politely to stop asking her

12  about Layana.

13      24.     March 18, 2014 was the first leadership meeting.  After the 2013-2014

14  season, Coach Ryan had a new idea for the team.  He chose 6 of his team's best

15  "leaders" and began "Leadership Meetings" to discuss the team's "Core

16  Covenants."  The Leadership Council was made up of the best leaders on the

17  basketball team: Krista, Bria, Ea, and Keitra as well as Plaintiffs.  Every leadership

18  meeting occurred with only Coach Ryan in his office.  No other coaches were there.

19  Coach Ryan would have them watch videos, write their ideas and opinions

20  discussing how to make the team more "successful", and have group discussions.

21  He would also discuss his beliefs on what the negatives and positives to their

22  specific team were.

23      25.     Towards the end of the 2014 spring semester, Adi began asking Haley

24  whom she would be living with in the summer.  Adi always asked, "Are you going

25  to be living with Layana?"  There are four people in each dorm and two people in

26  each room.  Adi would ask "Is Layana going to be sleeping in the same room as

27  you?" "Do you guys push your beds together?"  "Do you sleep together?"

28      26.     During March and April 2014, Adi was also asking Layana very similar

questions.  Adi would ask Layana these questions during every weekly academic meeting and every time she was in study hall.  Layana told Adi that Haley was her best friend and, "No, we are not dating."  Adi asked Layana if she "hung out and did things with her other best friends the same way she does with Haley."  Layana told her, "yes, because Haley is just my friend."  Also, every meeting Layana had with Adi, she would always say, "So how are you and Haley doing?"  Adi would ask this question in the tone as if Layana and Haley are dating.  Layana told Adi these questions were inappropriate and to "please stop."

### Coach Ryan Denounces Lesbianism

27.    On April 16, 2014 at 9 a.m., Coach Ryan had a leadership meeting in which he offended many of the girls on the leadership council.  Coach Ryan spoke on the topic of "lesbianism."  Coach Ryan specifically said the word "lesbianism" stating the following: "Lesbianism is not tolerated on this team.  It is the reason why teams lose."  "Lesbianism is a big concern in women's basketball."

### Complaints About Adi and Continued Harassment

28.    At the end of April 2014, Layana reported to Coach Ryan (no other coaches present) that Adi was constantly attempting to ascertain personal information from her regarding her private life.  Coach Ryan assured Layana that other teammates had also complained about Adi not focusing on academics and he would soon be having a coach monitor the meetings with Adi.  Layana told Coach Ryan that these questions occurred not only in her academic meetings but when she was in study hall as well.  However, Coach Ryan ignored, and was deliberately indifferent to the nature of Adi's inquiries and Layana's concerns about Adi's improper behavior in Study Hall, and elsewhere and neither Coach Ryan, nor anyone else at Pepperdine took any action to stop Adi from her harassing and invasive questions about Plaintiffs' sexual orientation or relationship.

29.    As a consequence of Pepperdine's deliberate indifference to Adi's harassing and discriminatory behavior, both Plaintiffs were deprived of the services

1 | of an academic advisor as provided to similarly situated students at Pepperdine were
2 | subjected to improper invasions of their privacy and deprived of educational
3 | opportunities.  Haley had to report to Adi before she left Pepperdine to turn in her
4 | books from the spring semester.  Adi and Haley were alone in the academic room,
5 | and that is when the questioning began.  Adi asked if Haley and Layana were going
6 | on a trip before break.  Haley admitted that they were going together to Vegas.

7 | 30.    In May 2014, Adi continued to ask Layana about Haley.  Layana told
8 | Adi that her constant questions about Haley were irritating her, and she asked Adi
9 | why she always questioned her about Haley's friendship.  Layana recalls Adi
10 | responding in a sarcastic way saying, "Because you and Haley are BFFs."  Adi then
11 | questioned Layana saying "Right?  You guys are just BFFs, right?  Or, are you closer
12 | than that?"  Layana still told Adi that "Haley and I are just friends" and to "please
13 | stop asking these questions."

14 | 31.    The day after Adi's birthday, Adi was telling Layana how she
15 | celebrated the night.  Adi told Layana she went to a nice restaurant and then said
16 | sarcastically "You should take Haley there sometime for a date, that would be cute."
17 | Before Haley came back to school from May break, Adi would ask Layana in study
18 | hall "Are you excited for Haley to come back?"  "Are you picking her up from the
19 | airport?"  "Will you guys be staying in the same dorm room for the summer?"

20 | **Invasions of Privacy and Retaliation**

21 | 32.    At the end of May 2014, Keitra, one of the teammates, warned Layana
22 | due to a meeting she just had with Coach Ryan.  Keitra confided the content of the
23 | meeting to Layana.  Layana learned that Coach Ryan, himself, was engaging in
24 | inappropriate inquiries regarding Plaintiffs' sexual orientation and relationship.
25 | Keitra reported that Coach Ryan asked her the following questions with no other
26 | coaches present.  "Are you dating Sahara?"  "Are Haley and Layana dating?"  Sahara
27 | is a female student at Pepperdine, and by Coach Ryan asking if Keitra is dating
28 | Sahara, he was implying she was lesbian.  Keitra denied these questions and asked

8

1  Coach Ryan where he heard these rumors.  Coach Ryan said he heard it from a staff
2  member that the players were with everyday.  Keitra told Layana to watch what she
3  says around the staff members.  Keitra told Layana that she thought the "staff
4  member" was Adi or Karissa, the athletic trainer.  When Haley returned to the
5  University, she confirmed with Keitra, that Coach Ryan asked her "Are Haley and
6  Layana dating?"  Keitra told him no.  Keitra also confided to Haley that Adi had
7  also asked Keitra if she was dating Sahara.

8      33.    In May 2014, Layana called a meeting with Coach Ryan to discuss
9  beginning to file her appeal to NCAA. Transfer students are not allowed to play
10  basketball for an entire year absent the appeal. Coach Ryan told Layana that he
11  would be "starting the process right away" and he would also "be in contact with
12  Pepperdine's athletic director, Dr. Potts, and the head of compliance, Brian Barrio,
13  to push the appeal through." Layana received no response from Coach Ryan about
14  her appeal or progress towards filing the appeal. Layana, like all NCAA transfer
15  athletes, cannot submit such an appeal on their own.  The athlete requires assistance
16  from the University's athletic department which includes their coach, athletic
17  director, and head of compliance.

18      34.    On June 4, 2014, Coach Ryan called individual meetings regarding the
19  training room and athletic trainer Karissa with the entire coaching staff were
20  present.  In Haley's meeting, Karissa falsely accused Haley of breaking many rules
21  in the training room dating all the way back into April.  Haley said the accusations
22  were not true, but Coach Ryan cut Haley off and told her she was lying and that she
23  was wrong.  Haley then told the coaches that Karissa was very unprofessional.
24  Coach Ryan asked her how, so Haley told them about how Karissa was asking
25  Haley if she ever dated girls and that Karissa told her that Coach Trisha was gay
26  which made Haley feel uncomfortable.  Both Coach Ryan, and Coach Trisha,
27  responded with deliberate indifference to Haley's complaints that Karissa had
28  harassed Haley about Haley's sexuality and that Karissa was furthering that

1   harassment by falsely accusing Haley of rules violations.  In response to Haley's

2   complaints, Coach Trisha was more concerned with her own standing at Pepperdine

3   and Coach Trisha laughed and said, "That is not true!"  Coach Ryan responded by

4   yelling at Haley and accused her of lying.

5       35.   In addition, Plaintiffs are informed and believe that, later that day,

6   when Coach Ryan (and/or others) confronted Karissa about Haley's claim that

7   Karissa had been inquiring about Haley's sexual orientation and disclosing

8   information about Coach Trisha, Karissa denied doing so.  However, Karissa

9   changed her story the next day and admitted that she had lied to Coach Ryan and

10   confessed to having the inappropriate conversations with Haley about Haley's and

11   Coach Trisha's sexual orientation.  Coach Ryan met with Karissa and Haley and

12   required that Karissa apologize to Haley for her the disclosures, and for lying about

13   it.  Haley then requested that Karissa also admit that she had been lying about

14   Haley's supposed misbehavior during rehab.  Coach Ryan refused to treat Haley's

15   concerns about Karissa's harassment seriously and responded by insisting that all of

16   these issues be "brushed under the rug".  When Haley would not accede to this

17   request, Coach Ryan began yelling and swearing at her.  Later, in the Title IX

18   investigation, it was confirmed that Karissa had been improperly changing the

19   records to make it appear as if Haley and Layana were arriving late for rehab (*i.e.*

20   breaking rules).

21       36.   On June 12, 2014, Layana met with athletic director Dr. Potts.  In the

22   meeting with Dr. Potts, Layana said, "I had a meeting with Coach Ryan in May

23   about filing my appeal to play right away.  But I have not seen any progress.  I

24   wanted to know what is going on with the process." Dr. Potts responded to Layana

25   saying, "I had no idea about your appeal." Layana was very confused and she said,

26   "I don't understand why Coach Ryan doesn't want to do my appeal.  I feel like he

27   doesn't want me to play right away.  I don't understand why and I don't know who

28   can help me if Coach Ryan doesn't want to file my appeal." Then Dr. Potts said,

1  "I'll take care of it. Just send me your NCAA appeal letter." Although Layana sent

2  information regarding her appeal to Dr. Potts through email after the meeting,

3  Layana did not receive any follow up of her appeal to this day. The University

4  announced news this summer that its men's basketball player A.J. Lapray had

5  received NCAA approval from his appeal to play immediately after transferring

6  from Oregon. Furthermore, Layana arrived to Pepperdine six months before A.J.

7  arrived to Pepperdine, yet his appeal was filed and approved first.

8      37.    Later in the month of June 2014, Coach Ryan made another comment

9  referring to intra-team dating. Coach Ryan made the following statement. "When I

10 was coaching for the LA Sparks, two of our players were dating and they broke up

11 in season. That was the reason our team fell apart and lost." Coach Ryan's

12 comments about lesbians were becoming obsessive and very strange. Both Layana

13 and Haley's coaches at their previous PAC 12 School would never have

14 conversations about intra-team dating and never did they use the word lesbianism.

15 Women's basketball is stereotyped for having many lesbians, and it is more

16 expected than prevented. When Haley and Layana heard Coach Ryan's statement

17 that he was against the lesbian lifestyle within his team, it made them think Coach

18 Ryan would pull their scholarships if he confirmed their relationship. At this point,

19 Layana began to suffer from severe depression.

20      38.    During June 2014, the following events took place. Adi asked Layana,

21 "So do you guys push your beds together in the dorm room? Do you guys sleep

22 together?" Whenever Layana saw Adi on Fridays in study hall, she would ask her,

23 "Are you taking your girl home with you this weekend?" referring to Haley. One

24 Friday, she asked Layana what she was going to do over the weekend and she told

25 Adi she was going to Disneyland. Adi then asked Layana, "Oh are you taking

26 Haley to Disneyland?" Layana said, "No, I'm taking my sister with me." Layana

27 asked Adi why she wanted to know if she was going to take Haley. Adi replied

28 sarcastically, "Because you guys are BFFs." These comments occurred when

1   Layana was in study hall supervised by Adi.

2       39.    When Layana achieved 3.0 GPA, the team rule required her to study in
3   study hall for 2 hours instead of 8 hours per week during the semester and 5 hours
4   per week during the summer.  Because of Adi's questions into Layana's sexual
5   orientation, she was looking forward to the reduction of study hall hours.  However,
6   Coach Ryan changed the GPA requirement from 3.0 to 3.2 immediately after
7   Layana achieved a GPA of 3.0.  When Coach Ryan changed the GPA requirement
8   he knew Adi's continued questioning during study hall was upsetting to Layana.
9   This increased requirement only applied to Layana since the other teammates had
10  GPAs that were either below 3.0 or above 3.2.

11      40.    When Layana and Haley were the only two practicing, Bria, one of
12  Plaintiffs' teammates, came up to Haley and Layana and asked if they had a minute
13  to talk.  Bria said, "Hey guys. I just want to let you know, be careful what you tell
14  Adi because she tells Coach Ryan everything."  Bria would not say why she made
15  this statement to only Haley and Layana, but she warned them to be very careful, as
16  if Adi had told Coach Ryan something bad about Haley and Layana.  After Bria left,
17  Layana and Haley believed that Adi told Coach Ryan that they were dating.  They
18  did not say anything to Bria because they were keeping their relationship very
19  secret. Haley and Layana agreed to make a more conscious effort to keep their
20  relationship confidential.  Haley and Layana were very afraid that if Coach Ryan
21  found out they were dating, he would take away their scholarships, especially after
22  the leadership meeting when he stated, "lesbianism is not tolerated here."

23      **False Allegations of Cheating and Additional Improper Inquires**

24      41.    In early July 2014, Adi falsely accused Plaintiffs of academic cheating.
25  The academic coordinator knowingly made the false charges in an effort to make
26  Plaintiffs quit the basketball team or be disqualified them from the team.  However,
27  there was no evidence of cheating and the charges were dropped.  On July 28, 2014
28  Coach Ryan sent a text message to Krista, Plaintiffs' teammate, that he was

12

1  disappointed that she wanted to live off-campus with Haley and Layana.  Robie,

2  another teammate, also told Haley and Layana that she was told by Coach Ryan not

3  to live with Haley and Layana off-campus because they were bad influences.  Robie

4  warned Haley and Layana that Coach Ryan is defaming them and trying to turn their

5  teammates against them. Robie said she was confused as to why he was doing this.

6  Robie did not know that Haley and Layana were dating.

7      42.   On August 25, 2014, Pepperdine commenced the fall semester and it

8  was the first day of school.  Haley and her teammate Allie were practicing in the

9  gym.  Allie told Haley that Coach Jordan had asked her if Layana and Haley were

10  dating.  Later that same night, Haley asked Bria if Coach Ryan had asked her

11  whether Layana and Haley were dating.  Bria confirmed that it was true.

12      43.   On August 26, 2014, Layana had a meeting with Coach Ryan and

13  Coach Mallorie.  In this meeting, she asked Coach Ryan if he had been asking

14  several teammates if Haley and her were dating. He denied these allegations.

15  Layana told Coach Ryan two players on the team said that he had asked them if she

16  and Haley were dating.  Layana also told him that Coach Jordan asked Allie if they

17  were dating. Coach Ryan said, "I know for a fact that that is not true.  My staff

18  doesn't gossip.  And gossip is what gets people fired."  Coach Ryan continued to

19  deny that he asked any girls, and he claimed that the players were making up these

20  rumors to start drama.  Coach Ryan suggested that Layana call a team meeting and

21  address this rumor.  Layana said she did not think that was necessary when she

22  could end the rumor in his office right then and there.  Then Coach Ryan called

23  Allie into this meeting to confirm her statement.  Allie confirmed that Coach Jordan

24  asked her. Coach Ryan then called Coach Jordan on speakerphone.  Coach Jordan

25  admitted that she asked Allie if Layana and Haley were dating.  Coach Ryan asked

26  Allie to leave and then kept asking Layana who were the other two girls who said he

27  asked about Haley and Layana dating.  Layana did not release any names.  Layana

28  told Coach Ryan that she promised her teammates she would not get them involved,

1  and all she wanted to do was end the rumor.  Coach Mallorie asked Layana why this
2  situation bothers her so much.  Layana answered, "Because I don't want that
3  reputation at this Christian school."  Then, Coach Mallorie asked, "So what is really
4  going on between you and Haley?  Are you dating?"  Layana told Coach Mallorie
5  that they were not dating.  Thus, Plaintiffs learned, from multiple sources, that
6  Coach Ryan, Coach Jordan, and others were making inappropriate and harassing
7  inquiries about Plaintiffs' relationship and sexuality and Plaintiffs reported and
8  complained about this to Coach Ryan.  His response was not only deliberate
9  indifference, Coach Ryan flat out lied and denied that he, or anyone else had asked
10 such questions about the Plaintiffs.  Then, when Coach Jordan admitted to the
11 misbehavior, the coaches continued with their questioning and refused to accept or
12 acknowledge the inappropriate, illegal and harmful effects of such questions,
13 especially at Pepperdine which is unwelcoming to LGBT students.

14    44.    On September 3, 2014, Layana went to the academic room with her
15 teammates, Keitra, Kelsey and Whitney, to do their study hall but there were no
16 more seats left.  The players all signed in together and did their homework in the
17 locker room.  Adi went into the study hall room and saw that they all signed in but
18 were not in the study hall room.  Adi called Coach Ryan and told him that
19 specifically Layana checked in for study hall but was not in the study hall room.

20    45.    On September 5, 2014, Coach Ryan called a meeting with Coach
21 Mallorie, Adi, and Layana.  In the meeting, Coach Ryan justified Adi's accusations
22 that Layana was not in the study hall room on September 3, 2014.  Coach Ryan said
23 he discussed it with Adi, and Layana would be receiving a punishment.  Out of all of
24 the players that were studying in the locker room, Layana was the only one to get
25 punished by Coach Ryan and Adi for not being in the academic room for study hall.
26 The other girls were not punished because Adi claimed that they all left her a note
27 on her desk before going to the locker room.  Layana was with the girls the entire
28

1 time and she knew for fact that they all did not leave any notes.  The punishment
2 was extra study hall hours the following week.

3      46.    After the meeting, Layana was sitting outside the coaches' office with
4 Haley finishing her homework.  Adi walked up to Layana's desk with a book she
5 needed for class.  Instead of handing it to Layana, Adi slammed the book on the
6 desk in front of her face.  Layana packed up her backpack and told Haley that she
7 needed to leave.  That night Layana attempted to commit suicide.

8                    **Invasions of Medical Privacy and Retaliation**

9      47.    In September 2014, Pepperdine, through a variety of its employees and
10 agents, including Karissa, Coach Ryan, and others, began retaliating against Haley
11 because of her complaints and invading her privacy.  Specifically, Pepperdine
12 retaliated by refusing to clear Haley to participate in basketball activities based on
13 an injury to her tailbone, of which Pepperdine had been aware since June 2014, and
14 which, in no way limited or affected her ability to play basketball.  Moreover,
15 Pepperdine unlawfully invaded Haley's privacy by demanding all of her
16 gynecological records, after she simply informed Karissa and Coach Ryan that she
17 was undergoing a routine screen for cervical cancer (which was negative).

18      48.    In June 2014, Haley reported to Karissa that she was experiencing pain
19 in her tailbone when she sat for long periods of time.  Haley reported that she
20 believed the injury was associated with basketball training, specifically
21 weightlifting.  Haley had not experienced any falls or other mishaps in everyday life
22 that would have caused an injury to her tailbone.  Haley also advised Karissa that
23 the injury did not, in any way, limit or affect her ability to run or play basketball.
24 Haley asked if an X-ray could be taken to check on the injury.  Karissa inexplicably
25 told Haley that the injury did not appear basketball-related, and that Haley would
26 need to pay for any X-ray herself, which, at that time, Haley could not afford.
27 Karissa did, however, arrange for Haley to be seen by the Team orthopedist in the
28 training room.  The Orthopedist checked Haley out, diagnosed a tailbone bruise, and

1 | provided a treatment plan of sitting on a pad, and taking Advil for the pain.  Neither
2 | Karissa, nor the Orthopedist imposed any restrictions on Haley's basketball
3 | activities at the time, nor refused to clear her to participate.  Over the summer, while
4 | vacationing in Mexico with her father, Haley experienced pain while sitting.
5 | Haley's father paid for her to see a doctor (Dr. Babak Barchohana) in California on
6 | August 2014 about her tailbone.  Haley visited Dr. Barchohana once and underwent
7 | an MRI.  Dr. Barchohana confirmed she had a tailbone bruise and prescribed a
8 | stronger painkiller than Advil, Norco, for when Haley would sit for long periods in
9 | class.  Dr. Barchohana did not restrict Haley's ability to practice or play basketball,
10 | in any way.

11 |     49.    In early 2014, Haley's annual gynecological check-up included an
12 | abnormal pap smear.  Haley's doctor, Nancy Taylor, merely recommended that she
13 | be rechecked in 6 months (instead of waiting a year).

14 |     50.    When Haley returned to school in September 2014, she advised Karissa
15 | about her visit to Dr. Barchohana and a scheduled recheck of her abnormal pap
16 | smear.

17 |     51.    When Haley returned to school in September 2014, she advised Karissa
18 | that she had visited Dr. Barchohana and that he had prescribed Norco (Haley and the
19 | other team members are required to disclose medications they are taking.)

20 |     52.    In September 2014, Dr. Taylor's office reminded Haley of the need for
21 | a follow-up test and an appointment was scheduled for September 12, 2014.  At
22 | about this time, Haley was suffering from the flu and was not participating in
23 | practice.

24 |     53.    On September 9, 2014 Haley advised both Karissa and Coach Ryan
25 | that she would miss practice on Friday September 12, 2014 because she had a
26 | doctor's appointment to recheck the abnormal pap test.

27 |     54.    The next day, September 11, 2014, Karissa dispatched a text and
28 | requested that Layana provide Karissa with all of Layana's gynecological records.

1   At about the same time Karissa sought Layana's medical records, Karissa contacted
2   Dr. Taylor seeking all of Haley's gynecological records.  Both Layana and Haley
3   refused to provide Pepperdine with access to their gynecological records because
4   these records had nothing to do with their fitness to participate in basketball
5   activities.  No similar requests for such records were made to women or men
6   participating in basketball at Pepperdine.

7       55.     Haley saw Dr. Taylor on September 12, 2014.  Dr. Taylor provided
8   Haley with the following, handwritten, note: "To whom it may concern:  I saw
9   Haley today for follow up of abnormal Pap smear.  This problem will have no
10  impact on her ability to play basketball."  Haley provided this note to Karissa.
11  However, Karissa inexplicably told Haley that the note was insufficient, and that
12  Haley would need to be cleared by Dr. Green in the Pepperdine Health Center.

13      56.     On September 16, 2014, Haley met with Dr. Green.  Haley provided
14  Dr. Green with the September 12, 2014 note from Dr. Taylor.  Dr. Green advised
15  Haley that she was cleared for the issue for which she was under the care of Dr.
16  Taylor.  In an effort to provide Pepperdine with the records they sought, Haley also
17  provided Dr. Green with a note from the doctor treating her for the flu.  That
18  handwritten note, from Dr. Afshine Emrani, and dated September 11, 2014 stated:
19  "To whom it may concern – Patient is under my care and has urine infection/flu
20  virus and is on antibiotics & should be able to go back to training Monday."  Before
21  Haley left the appointment, Dr. Green told her that he would need to run a
22  mandatory urine test to check if she had a urine infection.  (Later, Haley requested
23  Dr. Green's notes from the visit to see exactly what she was tested for, but the
24  Pepperdine Health Center did not provide her with any of Dr. Green's notes from
25  her visit.)

26      57.     Within hours after seeing Dr. Green at the Health Center on September
27  16, 2914, Haley received an email from Karissa stating, "You will not be cleared for
28  participation until the documentation from the spine specialist has been brought to

17

1  the athletic medicine center." As Haley had already left campus, she provided the

2  documents the next day. This email referred to the tailbone injury which Haley had

3  reported in June 2014, and for which the Pepperdine Orthopedist examined and for

4  which she had never been restricted from participating in basketball activities.

5      58.    On September 17, 2014, Haley called the health center and asked to

6  speak with Dr. Green to find out why she was not cleared for the tailbone issue.

7  Ultimately, Dr. Green advised Haley that he had been unaware of the tailbone issue,

8  and that she needed to provide documentation to Karissa. He responded via email to

9  the front desk that he did clear Haley because he was unaware of her spine condition

10  and Haley could not be cleared until she brought documentation to Karissa. Haley

11  provided Karissa with all of the documentation from her visit to Dr. Barchohana on

12  September 17, 2014 (the documentation included the MRI report and the

13  prescription for Norco).

14      59.    Karissa's sent Haley an email at 1:38 pm on September 17, 2014: "The

15  documents that you have provided regarding your doctor's visit at the Southern

16  California Orthopedic Institute do provide us with enough information. What we

17  need is a diagnosis, treatment plan, and any treatment recommends that the

18  physician has prescribed."

19      60.    Then, Karissa's boss Kevin, the Head Trainer, emailed Haley at 2:34

20  pm on September 17, 2014: "In order for medical clearance to be considered at

21  Pepperdine you have been asked to provide the athletic training center details of a

22  recent physician visit regarding your sacrum. Today you provided an MRI report to

23  the athletic training center ... Please get us the following information regarding your

24  sacrum: All the physician notes on diagnosis and plan for treatment."

25      61.    Haley called Coach Ryan and explained that Dr. Barchohana had

26  already released all of the documentation his office had on file for her. She asked

27  Coach Ryan if he can come with her to the training room to speak with Kevin and

28  Karissa about her seeing the basketball team orthopedic if it is necessary, to be

1 | cleared for her tailbone injury. Coach Ryan told her that he would not help her.
2 | Then, Haley sent an email to Kevin and addressed Kevin's request to a diagnosis
3 | and treatment. "Regarding your concerns for the diagnosis not being in the
4 | documentation, please note page 3 of my paperwork. Located above the
5 | prescription note is "DX" (diagnosis): "Coccygeal" (tailbone) pain." Neither Kevin
6 | nor Karissa responded to Haley's email that the diagnosis was on page 3.

7 |   62.  During this time when Pepperdine was seeking to invade, and invading,
8 | Haley and Layana's gynecological records and issues, and improperly refusing to
9 | clear Haley to participate in basketball activities, Karissa wrongly told Haley that "It
10 | is obvious you are hiding and lying about something."

11 |   63.  On September 18, 2014, Haley, after unsuccessful efforts to have her
12 | concerns addressed, met with Karina who is an assistant for the athletic director Dr.
13 | Potts. She told Karina that she felt Coach Ryan did not want her on the team
14 | anymore. She explained that Coach Ryan had told her there was nothing he could
15 | do about it and that neither Dr. Potts nor President Benton could help her. Karina
16 | told Haley that Dr. Potts was not there, but he could meet with her at 9 a.m. the next
17 | morning.

18 |   64.  On September 19, 2014, Haley met with Dr. Potts and Karina in his
19 | office. Dr. Potts was extremely rude in this meeting and he would not let her
20 | explain her side of the story. Within minutes, Haley was in tears by the way he was
21 | yelling at her for bringing this issue to his attention. Not only did Haley complain to
22 | Dr. Potts about not being cleared, Haley told him that Layana was also not cleared
23 | and had not been cleared to practice since May. Haley told Dr. Potts that it felt like
24 | the staff was trying to keep both Haley and Layana off the court and get them kicked
25 | out of the school. After class that day, Haley called Coach Ryan. On the phone,
26 | Haley said she needed to take the weekend to decide if she could be a part of the
27 | team. She said, "I am very unhappy with the way I have been treated here." Coach
28 | Ryan did not ask her why, but he said he wanted a decision by Sunday morning at 8

19

SECOND AMENDED COMPLAINT

1  a.m. because he did not want to "drag it on." Haley told him that she needed until
2  Monday to make a good decision.

3      65.    On Monday, September 22, 2014, Haley called Coach Ryan and told
4  him "I am not ready to make a decision today and I want to talk to you when you
5  return from Florida on Thursday to give me enough time to think." Coach Ryan
6  became very angry and said, "No, I do not want to drag this on. You will give me a
7  decision by 5 p.m." Haley told Coach Ryan, "You can say whatever you want but I
8  will not sign papers that I voluntarily quit. If you want to kick me off the team just
9  because I need more time to make a decision, that's your choice." Coach Ryan
10 refused and told Haley to give him a decision by 5 p.m. He said he would send an
11 email to Dr. Potts saying that Haley would voluntarily quit if she did not give Coach
12 Ryan a decision by that time. And, in fact, Coach Ryan dispatched an email at 9:11
13 p.m. on September 23, 2014, in which he stated that Haley's failure to make a
14 decision by his artificial deadline of 5:00 p.m. on Monday September 22, 2014
15 meant that Haley had quit the team and that Coach Ryan, and Pepperdine, was now
16 treating Haley as an ex-member of the team.

17     66.    On September 24, 2014, Haley sent Dr. Potts the following email. "I
18 would like to inform you of my last communication with Coach Ryan over text."
19 On Monday, September 22, Haley advised Coach Ryan in writing, "I have not made
20 a decision to quit. I would like to discuss the situation when you come back from
21 Florida. I have not voluntarily quit nor did I ever agree to Coach Ryan's deadline."

22     67.    Dr. Potts replied to Haley on the same day, "I understand that you have
23 expressed concerns regarding your participation as a student-athlete here and that an
24 investigation into those concerns has begun. Until then, as you requested, you are
25 relieved from all activities related to our women's basketball team."

26     68.    On November 7, 2014, Haley received the following letter from the
27 Title IX investigator Tabatha. "I have conducted a thorough investigation of your
28 claims and have attached a letter, which represents the conclusion to the

20

investigation.  After thoroughly investigating the allegations, I have found that there is insufficient evidence to conclude that harassment or sexual orientation discrimination occurred.  According to the team doctor, Dr. Gary Green has not received this documentation to medically assess your fitness to play."  The so-called "investigation" by the Title IX Investigator responded to the complaints by Plaintiffs in the same manner by which Pepperdine had responded to all prior complaints, by trying to "sweep under the rug" the fact that Plaintiffs had been subjected to harassment, discrimination, and retaliation, on account of their sexual orientation and same gender relationship.  The investigation was neither fair, thorough, nor proper.

69.     On December 1, 2014, Haley sent to the University the following note from her doctor.  "Based on her previous MRI findings, the patient's diagnosis and treatment plan remain unchanged.  It is acceptable for the patient to return to basketball without restriction.  No more notes/treatment are necessary at this time."  Notwithstanding neither Haley nor Layana have been cleared to play basketball.

**VI.**

## CLAIM I – VIOLATION OF RIGHT OF PRIVACY UNDER CALIFORNIA CONSTITUTION, ARTICLE 1, § 1

70.     Plaintiffs repeat the allegations set forth in paragraphs 1 through 69 as if set forth in full herein.

71.     California's Constitution provides that all citizens have an inalienable right to pursue and obtain a right to privacy.  Cal. Const. Art. I, § 1.

72.     Plaintiffs had reasonable expectations of privacy as to (a) their sexual orientation, (b) their personal relationship, and (c) their medical records and, specifically, their gynecological records, that were unrelated to their ability to play basketball for the Pepperdine varsity women's basketball team.

73.     These reasonable expectations of privacy entitled them to freedom from intrusion into these private matters by Pepperdine, Coach Ryan, the assistant

1 basketball coaches, the athletic trainers, the academic coordinators, and all other

2 members of Pepperdine's faculty, administrators, and staff.

3     74.    This right of privacy also protected Plaintiffs from the disclosure to

4 their parents and other persons from whom they had decided to keep their sexual

5 orientation private from having this information disclosed to them by Pepperdine, or

6 from having Pepperdine place Plaintiffs in the position of having to disclose the

7 information to such persons against Plaintiffs' will.

8     75.    Pepperdine, through its agents, Coach Ryan, the assistant basketball

9 coaches, the athletic trainers, the academic coordinators, and others, intentionally

10 intruded on Plaintiffs' right to privacy by (a) continually asking questions regarding,

11 and seeking to determine, Plaintiffs' sexual orientation and personal relationship, (b)

12 questioning other students and engaging in other efforts to determine Plaintiffs'

13 sexual orientation and personal relationship, and (c) demanding access to Plaintiffs'

14 gynecological records although Pepperdine had no basis to believe, and there was no

15 rational basis to believe, that those records would provide any information regarding

16 Plaintiffs' ability or qualifications to play on the varsity women's varsity basketball

17 team.

18     76.    By forcing Plaintiffs off the women's basketball team and revoking

19 their athletic scholarships, Pepperdine placed Plaintiffs in the position of having to

20 disclose to their parents and others from whom they had chosen to keep the

21 information confidential their sexual orientation, because their sexual orientation,

22 and Pepperdine's discrimination and harassment as a result of their sexual

23 orientation, are what resulted in the removal from the team, the elimination of their

24 scholarships, and their resulting withdrawal from the school.

25     77.    Plaintiffs suffered damages including financial damages and extreme

26 emotional distress as a result of Pepperdine's invasions of the right to privacy.

27     78.    Plaintiff White attempted suicide, was compelled to give up her

28 basketball scholarship, and leave Pepperdine because she did not have the financial

1  resources to continue to attend the university without her scholarship, which has

2  interrupted her education and undoubtedly ended her chance to pursue a career with

3  the WNBA.

4      79.    Plaintiff Videckis was compelled to give up her basketball scholarship,

5  and leave Pepperdine because she did not have the financial resources to continue to

6  attend the university without her scholarship, which has interrupted her education

7  and undoubtedly ended her chance to pursue a career with the WNBA.

8      80.    Pepperdine and its agents' ongoing and multiple intrusions into

9  Plaintiffs' right to privacy were substantial factors in the above decisions.

10     81.    Coach Ryan, an agent of Pepperdine, directly engaged in these

11  invasions into Plaintiffs' rights to privacy and/or was aware of the conduct of his

12  assistant coaches, trainers, and academic coordinator who were under his control

13  and direction.  Coach Ryan had actual knowledge of the conduct of those under his

14  control and direction, and either directed it, encouraged it, or was deliberately

15  indifferent to it, and refused to stop it or prevent it.

16     82.    Dr. Potts, Pepperdine's Athletic Director, had actual knowledge of the

17  invasions into Plaintiffs' rights to privacy by Coach Ryan, assistant coaches,

18  trainers, and academic coordinator who were under his control and direction, but

19  was deliberately indifferent to it and refused to stop or prevent it.

20     83.    Similarly, Tabatha, Pepperdine's Title IX Coordinator, had actual

21  knowledge of the invasions into Plaintiffs' rights to privacy by Coach Ryan,

22  assistant coaches, trainers, and academic coordinator who were under his control

23  and direction, but was deliberately indifferent to it and refused to stop or prevent it.

24  To the contrary, she issued a cover-up report after a sham investigation in which she

25  declined to review or consider evidence proffered by Plaintiffs and declined to

26  conduct interviews that would have confirmed Plaintiffs' reports.

27     84.    Pepperdine ratified the conduct through its agents, Coach Ryan, Dr.

28  Potts, and Tabatha, all of whom had actual and apparent authority to remedy

1 | Plaintiffs' complaints. Coach Ryan and Dr. Potts are managing agents of
2 | Pepperdine.

3 |     85.    Plaintiffs have suffered actual damages, including compensatory and
4 | emotional damages, as a result of Pepperdine's intrusions into their rights to privacy.

5 |     86.    Pepperdine's intrusions into Plaintiffs' rights to privacy were malicious
6 | and oppressive, and its agents acted with reckless and callous disregard of or
7 | indifference to Plaintiffs' rights such that Plaintiffs are entitled to punitive and
8 | exemplary damages for the Pepperdine's conduct.

9 |     **WHEREFORE**, Plaintiffs respectfully request that this Honorable Court
10 | enter judgment against Pepperdine by awarding compensatory damages, punitive
11 | damages, and such other and further relief as this Court deems reasonable and just.

12 | ## VII.

13 | ## CLAIM II – VIOLATION OF CALIFORNIA EDUCATIONAL CODE §220.
14 | ## 66251. 66270

15 | ### Disparate Treatment - Discrimination

16 |     87.    Plaintiffs incorporate by reference each and every allegation contained
17 | in paragraphs 1 through 86 as though set forth fully herein.

18 |     88.    Coach Ryan intentionally discriminated against Plaintiffs because he
19 | believed that they were lesbians having a relationship.

20 |     89.    Plaintiffs received disparate treatment as they were treated differently
21 | than the other students in the University including but not limited to the following.
22 | Other students were not subject to pervasive questioning about their sexual
23 | orientation. Other players were not required to submit their gynecology medical
24 | records. Other players, unlike Haley and Layana, were not punished unfairly for
25 | minor violations and/or given lesser punishments. Other injured players, unlike
26 | Layana, were allowed to attend basketball practice. Appeals to the NCAA so that
27 | the basketball players could play immediately were routinely and immediately
28 | processed for other players but Layana's appeal was never processed. Other players

1  only had to provide minimal information to the trainers about non-basketball injury.
2  Haley was required to provide extensive medical documents including doctor's
3  notes. Other players had the support of the coach in getting medical clearance from
4  the trainers. Haley had no support from her coach.

5       90.    Coach Ryan is responsible for the discrimination of his assistant
6  coaches, trainers and academic coordinator because he directed and encouraged the
7  discrimination. He had actual knowledge of the discrimination and was deliberately
8  indifferent to it.

9       91.    The athletic director had actual knowledge of the discrimination and
10  was deliberately indifferent to it.

11       92.    The Title IX coordinator had actual knowledge of the discrimination
12  and was deliberately indifferent to it.

13       93.    Defendant Pepperdine University had actual knowledge of the
14  discrimination and was deliberately indifferent to it.

15       94.    Defendant's motive in the discrimination was to get Plaintiffs off the
16  basketball team because they were lesbians who were in a relationship. This
17  discrimination was a substantial factor in causing Plaintiffs' harm.

18       95.    Plaintiffs' harm included among other things the following. Layana
19  suffered extreme emotional distress which resulted in her attempted suicide. She
20  was forced to give up playing basketball, lose her scholarship and leave the
21  University. Haley suffered extreme emotional distress, the wrongful
22  disqualification of playing basketball for the team, the loss of her scholarship, and
23  leaving the University.

24       96.    Defendant Pepperdine University ratified the discrimination once it had
25  knowledge of the conduct and refused to prevent it from continuing. Coach Ryan
26  was responsible for the discrimination and was a managing agent of the University.
27  The discrimination was malicious and oppressive. Therefore, Plaintiffs are entitled
28  to punitive damages.

SECOND AMENDED COMPLAINT

**Harassment**

97.   Coach Ryan intentionally, severely, and pervasively harassed Plaintiffs because they were lesbians who were having a relationship on the team by including but not limited to the following.  He continually asked questions about their sexual orientation.  He encouraged his assistant coaches, trainers and academic coordinator to ask questions about Plaintiffs' sexual orientation.  He punished Plaintiffs unfairly for minor violations.  The trainers demanded Plaintiffs furnish their complete current and future gynecologist medical report for no legitimate reason.  He refused to allow Layana to attend basketball practice because of her injury.  He refused to process Layana's appeal to the NCAA so that she can play immediately.  He refused to allow Haley to play basketball on the basis that she had not provided sufficient medical information on her non-basketball injury.  He refused to help Haley to get medical clearance from the trainers.

98.   The harassing conduct was so severe, and pervasive that a reasonable person in Plaintiffs' circumstances would have considered the University's environment to be hostile and abusive.  Plaintiffs considered the University's environment to be hostile and abusive.

99.   Coach Ryan is responsible for the harassment of his assistant coaches, trainers and academic coordinator because he directed and encouraged the harassment.  He had actual knowledge of the harassment and was deliberately indifferent to it.

100.   The athletic director had the actual knowledge of the harassment and was deliberately indifferent to it.

101.   The Title IX compliance officer had the actual knowledge of the harassment and was deliberately indifferent to it.

102.   Defendant Pepperdine University had the actual knowledge of the harassment and was deliberately indifferent to it.

103.   Defendant's motive in the discrimination was to get Plaintiffs off the

1  basketball team because they were lesbians who were in a relationship. This
2  harassment was a substantial factor in causing Plaintiffs' harm.

3    104. Plaintiffs' harm included among other things the following. Layana
4  suffered extreme emotional distress which resulted in her attempted suicide. She
5  was forced to give up playing basketball, lose her scholarship and leave the
6  University. Haley suffered extreme emotional distress, the disqualification of
7  playing basketball for the team, the loss of her scholarship, and leaving the
8  University.

9    105. Defendant Pepperdine University ratified the harassment once it had
10  knowledge of the conduct and refused to prevent it from continuing. Coach Ryan
11  was responsible for the harassment and was a managing agent of the University.
12  The harassment was malicious and oppressive. Therefore, Plaintiffs are entitled to
13  punitive damages.

14                                    **Retaliation**

15    106. Plaintiffs complained to the athletic director that Coach Ryan, his
16  assistant coaches, trainers and academic coordinator had harassed and discriminated
17  against them because Coach Ryan believed that Plaintiffs were lesbians who were in
18  a relationship on the team.

19    107. Plaintiffs' reporting of Coach Ryan's conduct and that of his assistant
20  coaches, trainers and academic coordinator to the athletic director was a motivating
21  factor in Coach Ryan continuing to harass and discriminate them.

22    108. Coach Ryan is responsible for the retaliatory conduct of his assistant
23  coaches, trainers and academic coordinator because he directed and encouraged
24  their retaliatory conduct. He had actual knowledge of the retaliatory conduct and
25  was deliberately indifferent to it.

26    109. The athletic director had the actual knowledge of the retaliatory
27  conduct and was deliberately indifferent to it.

28    110. The Title IX coordinator had the actual knowledge of the retaliatory

1 | conduct and was deliberately indifferent to it.

2 | 111.   Defendant Pepperdine University had the actual knowledge of the
3 | retaliatory conduct and was deliberately indifferent to it.

4 | 112.   The retaliatory conduct was a substantial factor in causing Plaintiffs'
5 | harm.

6 | 113.   Plaintiffs' harm included among other things the following: Layana
7 | suffered extreme emotional distress which resulted in her attempted suicide.  She
8 | was forced to give up playing basketball, lose her scholarship and leave the
9 | University.  Haley suffered extreme emotional distress, the disqualification of
10 | playing basketball for the team, the loss of her scholarship, and leaving the
11 | University.

12 | 114.   Defendant Pepperdine University ratified the retaliatory conduct once it
13 | had knowledge of the conduct and refused to prevent it from continuing.  Coach
14 | Ryan was responsible for the retaliatory conduct and was a managing agent of the
15 | University.  The retaliatory conduct was malicious and oppressive.  Therefore,
16 | Plaintiffs are entitled to punitive damages.

17 | **VIII.**

18 | **CLAIM III – VIOLATION OF TITLE IX, 20 U.S.C. §§ 1681, ET SEQ.**
19 | **(Deliberate Indifference to Harassment)**

20 | 115.   Plaintiffs repeat the allegations set forth in paragraphs 1 through 114 as
21 | if set forth in full herein.

22 | 116.   At all relevant times, the educational programs and/or activities at
23 | Pepperdine received federal financial assistance.  Pepperdine receives Federal
24 | financial assistance through, inter alia, the Pell Grants that fund the education of
25 | certain Pepperdine students, as well as other funds.

26 | 117.   Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, et
27 | seq. ("Title IX") provides that "[n]o person in the United States shall, on the basis of
28 | sex, be excluded from participation in, be denied the benefits of, or be subjected to

1 discrimination under any education program or activity receiving Federal financial

2 assistance." 20 U.S.C. § 1681(a).

3      118. Title IX defines the educational institutions covered by its requirements

4 as "any public or private preschool, elementary, or secondary school, or any

5 institution of vocational, professional, or higher education . . ." 20 U.S.C. §

6 1681(c).

7      119. Title IX confers a benefit on persons discriminated against on the basis

8 of sex, and Plaintiff and the Class clearly are member of that class for whose special

9 benefit the statute was enacted.

10      120. Plaintiffs had a right to not be subject to sexual discrimination,

11 harassment or abuse while they participated in the educational programs and

12 activities while students at Pepperdine.

13      121. Pepperdine's harassment and discrimination against Plaintiffs by

14 members of its administration, faculty, and staff are sexual discrimination and/or

15 harassment prohibited by Title IX, 20 U.S.C. §§ 1681, et seq. because such

16 harassment was based on their gender and their failure to conform to stereotypical

17 views of females.

18      122. Plaintiffs' reports, and attempts to report, to Pepperdine's Head Coach

19 of the Women's Basketball Team, its Athletic Director, and Title IX Coordinator,

20 were reports to appropriate persons including Coach Ryan, Dr. Potts, and Tabatha,

21 the Title IX Coordinator, who had authority to take corrective action that could have

22 ended the discrimination.

23      123. Further, Plaintiffs are informed and believe that Pepperdine, through

24 these representatives and others, had actual notice of the pervasive harassment of,

25 discrimination of, and violation of LGBT students' rights as a result of prior

26 complaints concerning actions by the faculty, administration, and staff.

27      124. Plaintiffs are informed and believe that Coach Ryan, Dr. Potts and

28 Tabatha each had authority to address the acts of discrimination and harassment, and

29

1 institute corrective measures including, but not limited to, protecting Plaintiffs from
2 such treatment.

3     125.   The decisions of these individuals, and each of them, to refuse to
4 address Plaintiffs' allegations, to continue the systemic policies and practices
5 directed at them despite multiple complaints, and to refuse institute any corrective
6 measures, were official decisions to ignore the pervasive and serious harassment and
7 discrimination to which Plaintiffs were being subjected on account of their sex,
8 gender, and failure to conform to stereotypical views of females.

9     126.   These actions, and inactions, by these individuals amounted to
10 deliberate indifference by Pepperdine to the reports, and to Plaintiffs' rights to not
11 be subject to sexual discrimination, harassment, or abuse while they participated in
12 the educational programs and activities, including, but not limited to, the women's
13 varsity basketball program while students at Pepperdine.

14     127.   As a result of this deliberate indifference Plaintiffs have been faced
15 with the dilemma of maintaining strict secrecy and confidentiality over their private
16 lives or risk harassment or even expulsion from Pepperdine.

17     128.   Pepperdine's harassment of Plaintiffs, its repeated failure to take
18 corrective actions, and its deliberate indifference to Plaintiffs' reports were
19 malicious and oppressive, and its agents acted with reckless and callous disregard of
20 or indifference to Plaintiffs' complaints and well-being such that Plaintiffs are
21 entitled to punitive and exemplary damages for the Pepperdine's conduct.

22     **WHEREFORE**, Plaintiffs respectfully request that this Honorable Court
23 enter judgment against Pepperdine by awarding compensatory damages, attorneys'
24 fees and costs pursuant to 42 U.S.C. § 1988, punitive damages, and such other and
25 further relief as this Court deems reasonable and just.

26 / / /
27 / / /
28 / / /

# IX.

## CLAIM IV – VIOLATION OF TITLE IX, 20 U.S.C. §§ 1681, ET SEQ.

### (Systemic Intentional Discrimination)

129.   Plaintiffs repeat the allegations set forth above in paragraphs 1 through 128 as if set forth herein in full.

130.   At all relevant times, the educational programs and/or activities at Pepperdine received federal financial assistance.  Pepperdine receives Federal financial assistance through, inter alia, the Pell Grants that fund the education of certain Pepperdine students and other funds.

131.   Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, et seq. ("Title IX") provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

132.   Title IX defines the educational institutions covered by its requirements as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education . . ." 20 U.S.C. § 1681(c).

133.   Title IX confers a benefit on persons discriminated against on the basis of sex, and Plaintiff and the Class clearly are member of that class for whose special benefit the statute was enacted.

134.   Pepperdine represents in its promotional materials to applicants and its official communications to students, such as in the Student Handbook, that ""We do not unlawfully discriminate on the basis of any status or condition protected by applicable federal or state law. .. We respect the inherent worth of each member of the community.  We do not engage in any forms of harassment of others."

135.   Contrary to these representations Pepperdine has an express policy and practice, known to its administration, faculty, and staff, that it in fact discriminates

1  against students that are, or that Pepperdine perceives to be, LGBT.

2      136.   Pursuant to Pepperdine's official, but publicly undisclosed, policy and

3  practice, it urges its administration, faculty, and staff to engage in efforts to identify

4  students believed to be LGBT, to pressure those students to disclose their sexual

5  orientation, and then to harass or pressure those students who are identified as

6  LGBT to withdraw from school, be eliminated from any athletic teams (including

7  the elimination of any athletic scholarships), and/or to be expelled from the school.

8      137.   In furtherance of its goal to remove the appearance of any and all

9  LGBT students from its sports teams and student body, Pepperdine engages in a

10  pattern and practice of surveillance, intrusive questioning, and harassment of

11  students Pepperdine believes, or perceives, to be LGBT.

12      138.   Students that are, or that appear to be LGBT, are discriminated against

13  as compared to students who are not, or who are not perceived as being, LGBT.

14  Students who are, or who appear or are presumed to be, heterosexual are treated

15  differently by Pepperdine in terms of their participation in student athletics, their

16  participation in the university's educational programs and activities, and the

17  enforcement of university policies such as the school's sexual behavior policy.

18      139.   Harassment based on sexual orientation, perceived sexual orientation,

19  and/or failure to comply with expected gender roles, is harassment based on "sex"

20  for purposes of Pepperdine's obligations under Title IX not to discriminate against

21  students based on their sex.

22      140.   Plaintiffs are informed and believe that Pepperdine's policies and

23  practices are directed from and/or endorsed by the highest level of the school's

24  administration.

25      141.   Pepperdine's policies and practices directed at the identification,

26  harassment, and targeting of LGBT students, and those perceived to be LGBT,

27  amount to institutional discrimination by Pepperdine in violation of Title IX

28  including the requirement that students not be excluded from participation in

SECOND AMENDED COMPLAINT

1  programs based on their sex.

2      142.  Pepperdine's policies and practices, and their effect on Plaintiffs, were

3  malicious and oppressive, and its agents acted with reckless and callous disregard of

4  or indifference to Plaintiffs' rights such that Plaintiffs are entitled to punitive and

5  exemplary damages for the Pepperdine's conduct.

6      **WHEREFORE**, Plaintiffs respectfully request that this Honorable Court

7  enter judgment against Pepperdine, by awarding compensatory damages, punitive

8  damages, attorneys' fees pursuant to 42 U.S.C. § 1988, and costs, and such other

9  and further relief as this Court deems reasonable and just.

10                            **X.**

11  **CLAIM V – VIOLATION OF TITLE IX, 20 U.S.C. §§ 1681, ET SEQ.**

12        **(Retaliation for Complaints About Discrimination)**

13     143.  Plaintiffs repeat the allegations set forth above in paragraphs 1 through

14  142 as if set forth herein in full.

15     144.  At all relevant times, the educational programs and/or activities at

16  Pepperdine received federal financial assistance.  Pepperdine receives Federal

17  financial assistance through, inter alia, the Pell Grants that fund the education of

18  certain Pepperdine students.

19     145.  Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, et

20  seq. ("Title IX") provides that "[n]o person in the United States shall, on the basis of

21  sex, be excluded from participation in, be denied the benefits of, or be subjected to

22  discrimination under any education program or activity receiving Federal financial

23  assistance." 20 U.S.C. § 1681(a).

24     146.  Title IX defines the educational institutions covered by its requirements

25  as "any public or private preschool, elementary, or secondary school, or any

26  institution of vocational, professional, or higher education . . ." 20 U.S.C. §

27  1681(c).

28     147.  Title IX confers a benefit on persons discriminated against on the basis

1 of sex, and Plaintiff and the Class clearly are member of that class for whose special
2 benefit the statute was enacted.

3     148.  Pepperdine retaliated against Plaintiffs after they reported the
4 harassment and discrimination to which they were being subjected to persons with
5 authority to address the acts of discrimination and harassment, and institute
6 corrective measures, including Coach Ryan, Dr. Potts and Tabatha, Pepperdine's
7 Title IX Coordinator.

8     149.  Specifically, after Plaintiffs reported and complained about the
9 harassment to which they were being subjected, including complaints made to the
10 Coaches and other staff as alleged herein.

11     150.  Retaliation against students who report harassment based on their
12 sexual orientation, their perceived sexual orientation, and/or their failure to conform
13 to stereotypical views of females is actionable discrimination under Title IX.

14     151.  Pepperdine's retaliation toward Plaintiffs was malicious and
15 oppressive, and engaged in with reckless and callous disregard of or indifference to
16 Plaintiffs' complaints and well-being such that Plaintiffs are entitled to punitive and
17 exemplary damages for the Pepperdine's conduct.

18     **WHEREFORE**, Plaintiffs respectfully request that this Honorable Court
19 enter judgment against Pepperdine by awarding compensatory damages, attorneys'
20 fees and costs pursuant to 42 U.S.C. § 1988, punitive damages, and such other and
21 further relief as this Court deems reasonable and just.

22 **RELIEF REQUESTED**

23
24     WHEREFORE, Plaintiffs pray for judgment against all Defendants as
follows:

25       a.  For compensatory damages;
26       b.  For emotional distress;
27       c.  For punitive damages;
28

1    d. For prejudgment and post judgment interest;

2    e. For costs of suit;

3    f. For attorney's fees; and for

4    g. Such other and further relief as this court may deem proper and just.

5

6    Dated: May 6, 2015                    Respectfully submitted:

7                                          **ZUBER LAWLER & DEL DUCA LLP**
8                                          JEREMY J. GRAY
                                           JEFFREY J. ZUBER
9

10

11                               By: */s/ Jeremy J. Gray*
12                                   Attorneys for Plaintiffs Haley Videckis
                                     and Layana White
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35
                                                       SECOND AMENDED COMPLAINT

# DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: May 6, 2015                    Respectfully submitted:

**ZUBER LAWLER & DEL DUCA LLP**
JEREMY J. GRAY
JEFFREY J. ZUBER


By: */s/ Jeremy J. Gray*
Attorneys for Plaintiffs Haley Videckis
and Layana White

1

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action.** I am employed in the County of Los Angeles, State of California. My business address is 777 S. Figueroa Street, 37th Floor, Los Angeles, California 90017 USA.

On May 6, 2015, I served true copies of the following document(s) described as **SECOND AMENDED COMPLAINT FOR DAMAGES:** on the interested parties in this action as follows:

Paula Tripp Victor
ptv@amclaw.com
Peter B. Rustin
pbr@amclaw.com
ANDERSON, McPHARLIN &
CONNERS LLP
444 South Flower Street 31st Floor
Los Angeles, California 90071-2901
Telephone: (213) 688-0080
Facsimile: (213) 622-7594
Attorneys for Defendant Pepperdine
University

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I caused said document(s) to be served by means of this Court's electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, to the parties and/or counsel who are registered CM/ECF Users set forth in the service list obtained from this Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 6, 2015, at Los Angeles, California.

*/s/ Debbie J. Ellis*
Debbie J. Ellis

1

SECOND AMENDED COMPLAINT