O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HALEY VIDECKIS AND LAYANA WHITE, | ) ) ) | Case No. CV 15-00298 DDP (JCx) |
| Plaintiffs, | ) ) | **ORDER DENYING DEFENDANT** |
| v. | ) ) | **PEPPERDINE UNIVERSITY'S MOTION TO DISMISS THIRD, FOURTH, AND FIFTH** |
| PERPPERDINE UNIVERSITY, a corporation doing business in California, | ) ) ) ) | **CAUSES OF ACTION OF THE THIRD AMENDED COMPLAINT** |
| Defendant. | ) ) | [Dkt. No. 33] |
| _____ | ) ) | |

Presently before the Court is Defendant Pepperdine University ("Pepperdine")'s Motion to Dismiss the Third, Fourth and Fifth Causes of Action of the Third Amended Complaint and Prayer for Prejudgment Interest Pursuant to Fed. R. Civ. P. 12(b)(6) ("MTD"). (Dkt. No. 33.)  Having considered the parties' submissions and heard oral argument, the Court DENIES the motion and adopts the following order.

///

///

///

# I.   BACKGROUND

Plaintiffs in this case are Haley Videckis ("Videckis") and Layana White ("White").  Videckis is a former member of Pepperdine's women's basketball team who transferred to Pepperdine from Arizona State University in July 2013.  (Third Amended Complaint ("TAC"), Dkt. No. 31, ¶¶ 1, 47.)  White is also a former member of Pepperdine's women's basketball team who transferred to Pepperdine from Arizona State University in January 2014.  (TAC ¶¶ 2, 47.)  Defendant Pepperdine is a university located in California.  (<u>Id.</u> ¶ 3.)  Pepperdine receives funds from the federal government and from the state of California.  (<u>Id.</u>)  Ryan Weisenberg ("Coach Ryan") is the head coach of the Pepperdine women's basketball team.  (<u>Id.</u> ¶ 7.)  Adi Conlogue ("Conlogue") is an athletic academic coordinator of the Pepperdine women's basketball team.  (<u>Id.</u> ¶ 13.)

Plaintiffs' suit arises out of allegedly intrusive and discriminatory actions that Pepperdine and its employees committed against Plaintiffs on account of Plaintiffs' dating relationship. Plaintiffs allege that, in the spring of 2014, Coach Ryan and others on the staff of the women's basketball team came to the conclusion that Plaintiffs were lesbians and were in a lesbian relationship.  (<u>Id.</u> ¶ 17.)  Plaintiffs further allege that Coach Ryan and the coaching staff were concerned about the possibility of the relationship causing turmoil within the team.  (<u>Id.</u>) Plaintiffs allege that, due to their concerns, Coach Ryan and members of the coaching staff harassed and discriminated against Plaintiffs in an effort to force Plaintiffs to quit the team. (<u>Id.</u>)

1    Plaintiffs allege that, beginning in February 2014, Conlogue
2    would hold individual meetings with each of the Plaintiffs in order
3    to determine Plaintiffs' sexual orientation and their relationship
4    status. (<u>Id.</u> ¶¶ 19-22.)  During these meetings Conlogue
5    specifically asked Plaintiffs whether there were any gay or
6    bisexual players on the women's basketball team. (<u>Id.</u> ¶ 21.)
7    Conlogue would ask follow-up questions consisting of, among other
8    things, how close Plaintiffs were, whether they took vacations
9    together, where they slept, whether they pushed their beds
10   together, whether they went on dates, and whether they would live
11   together. (<u>Id.</u> ¶ 22)  The questioning lasted at least through June
12   2014. (<u>Id.</u> ¶ 25.)

13       At the end of April, White reported to Coach Ryan that
14   Conlogue was constantly trying to obtain information about White's
15   personal life instead of focusing on White's academics. (<u>Id.</u> ¶
16   28.)  Coach Ryan assured White that he would soon have a coach
17   monitor the players' meetings with Conlogue, as other teammates had
18   also complained about Conlogue not focusing on academics. (<u>Id.</u>)
19   Plaintiffs allege that Coach Ryan did not take any action to stop
20   Conlogue's inquiries into their personal lives. (<u>Id.</u>)  Plaintiffs
21   further allege that Conlogue's persistent questioning during study
22   hall deprived them of educational opportunities that other
23   students, similarly situated at Pepperdine, received. (<u>Id.</u>)

24       On April 16, 2014, Coach Ryan held a team leadership meeting
25   where he spoke on the topic of lesbianism. (<u>Id.</u> ¶ 27.)  In the
26   meeting, Coach Ryan stated that lesbianism was a big concern for
27   him and for women's basketball, that it was a reason why teams
28   lose, and that it would not be tolerated on the team. (<u>Id.</u>)

In May 2014, White met with Coach Ryan to discuss filing an appeal to the NCAA that would allow her to play basketball in her first year as a transfer student. (Id. ¶ 33.) Coach Ryan assured White that he would be starting the process right away. (Id.) Afterwards, however, White received no updates on the progress of the appeal. (Id.) On June 12, 2014 White met with the Pepperdine athletic director, Dr. Steve Potts ("Dr. Potts"), at Pepperdine, and learned that Dr. Potts had not been informed of any appeal on her behalf. (Id. ¶ 36.)

White alleges that Dr. Potts offered to process the appeal for her, but that she still has not received a follow up on the status of her appeal. (Id.) White further alleges that another male basketball player who transferred to Pepperdine was approved to play in 2015 immediately after transferring despite the fact that White was admitted to Pepperdine before the male player. (Id.)

On June 4, 2014, Videckis complained to the coaching staff that Karissa Scherer ("Scherer"), an athletic trainer, had been asking Videckis inappropriate questions about dating women. (Id.) Additionally, Plaintiffs claim that Scherer falsely accused them of breaking the training room rules. (Id. ¶ 34.) Videckis alleges that Coach Ryan accused her of lying when she complained about the inappropriate questions. (Id.) However, the next day Scherer admitted to Coach Ryan that she did ask Videckis inappropriate questions about her sexual orientation, and Coach Ryan required the athletic trainer to apologize to Videckis. (Id. ¶ 35.) Coach Ryan ignored Scherer's accusations against Videckis for breaking the training room rules. (Id.) A Title IX investigation confirmed

4

1  that Scherer improperly changed the time records so that Videckis

2  and White appeared to arrive late to their training.  (Id.)

3       Plaintiffs further allege that, in early July, Conlogue

4  falsely accused Plaintiffs of academic cheating.  (Id. ¶ 41.)

5  Plaintiffs allege that there was no evidence to substantiate

6  Conlogue's claim, and the charges were later dropped.  (Id.)  Later

7  in July, Coach Ryan reached out to two of Plaintiffs' teammates,

8  recommended that the teammates not live with Plaintiffs, and stated

9  that Plaintiffs were bad influences.  (Id.)  One of those teammates

10 subsequently came forward to Plaintiffs, informing them that Coach

11 Ryan was trying to turn the other players on the team against them.

12 (Id.)

13      On August 26, 2014, Coach Ryan and another member of the

14 coaching staff asked two of Plaintiffs' teammates whether

15 Plaintiffs were dating.  (Id. ¶ 42.)  When Plaintiffs found out

16 that the coaches had been asking their teammates about Plaintiffs'

17 relationship status, White confronted Coach Ryan about the

18 questioning.  (Id.)  During this meeting, White was able to confirm

19 that the coaching staff had been asking teammates whether

20 Plaintiffs were dating.  (Id.)

21      At some time during the semester, White raised her GPA to a

22 3.0, which under the team rules allowed her to attend study hall

23 for fewer hours.  (Id. ¶ 39.)  White alleges that Coach Ryan

24 immediately changed the team rule to require a minimum GPA of 3.2

25 instead of 3.0, in an effort to force White to interact with

26 Conlogue in study hall.  (Id.)

27      In early September 2014, Conlogue and the coaching staff

28 accused White of being absent from a required study hall and

1  punished White.  (Id. ¶ 44.)  After the meeting where Coach Ryan

2  and Conlogue issued White's punishment, Conlogue walked up to White

3  with a book White needed and slammed the book on the desk in front

4  of White.  (Id.)  That night, White attempted to commit suicide.

5  (Id.)

6      In June 2014, Videckis reported to Scherer that she was

7  experiencing pain in her tailbone that she believed stemmed from

8  basketball training, but that the injury would not affect her

9  ability to play basketball.  (Id. ¶ 48.)  Videckis saw two separate

10 doctors, neither of whom restricted her ability to play basketball.

11 (Id.)

12      On September 9, 2014, Videckis informed Coach Ryan that she

13 would miss practice on September 12 because she was getting tested

14 for cervical cancer.  (Id. ¶ 53.)  Videckis alleges that Scherer

15 requested her gynecological records, but that she refused to give

16 Pepperdine access because those records were unrelated to her

17 ability to play basketball.  (Id. ¶ 54.) Plaintiffs allege that no

18 other women or men on the basketball teams were asked to provide

19 similar medical records.  (Id.)

20      On September 16, 2014, Videckis met with Dr. Green at the

21 Pepperdine Health Center, who told her that she was cleared for her

22 condition.  (Id. ¶ 56.)  After leaving her appointment that day,

23 Videckis received an email from Scherer that stated Videckis would

24 not be cleared for participation unless she provided the athletic

25 medicine center with documentation from a spine specialist relating

26 to her tailbone injury.  (Id. ¶ 57.)

27      On September 17, Videckis called the health center to request

28 documentation.  (Id.)  That same day, Videckis brought her "MRI,

6

diagnosis, and treatment of prescription" to the athletic training room.  (Id. ¶ 58.)  Afterwards, Videckis received emails from the athletic trainers informing her that the documentation she provided was insufficient, and that she needed to provide them with a diagnosis and treatment plan.  (Id. ¶ 59.)  Videckis spoke with Coach Ryan, telling him that she had given the trainers all of the documentation the doctor's office had on file for her.  (Id. ¶ 61.)  Videckis requested Coach Ryan's assistance in speaking with the trainers to clear her for her tailbone injury, but Coach Ryan informed Videckis that he would not help her.  (Id.)  Videckis replied to the emails, informing the trainers that her diagnosis was in the documentation she had provided, but received no response.  (Id.)

On September 19, 2014, Videckis met with Dr. Potts, the Pepperdine athletic director, and told him of her concerns regarding unfair treatment by the women's basketball staff.  (Id.)  Videckis told Dr. Potts that she felt that the coaching staff was trying to keep her and White from playing, and furthermore that they were trying to get Plaintiffs kicked out of the school.  (Id. ¶ 64.)  Videckis alleges that Dr. Potts was very rude during the meeting and also that he yelled at her for bringing the issue to his attention.  (Id.)

That same day, Videckis called Coach Ryan and told him that she was very unhappy with the way she had been treated.  (Id.)  Coach Ryan then told her that she would need to make a decision as to whether she wanted to remain on the team by Sunday.  (Id.)  Videckis told him that she would need until Monday.  (Id.)  On Monday, Videckis called Coach Ryan and told him that she needed

1    more time.  (Id.)  In response, Coach Ryan told her that he needed

2    her decision by 5pm that day; otherwise, he would tell Dr. Potts

3    that Videckis had quit voluntarily.  (Id. ¶ 65.)

4         Videckis sent Dr. Potts an email on September 24, stating that

5    she had not made a decision to quit, and that she would like to

6    speak with Dr. Potts later that week when she was back in town.

7    (Id. ¶ 66.)  Dr. Potts replied, saying that due to Videckis'

8    concerns, the school had begun an investigation, and that until

9    then, as requested, Videckis would be relieved from activities

10   having to do with the basketball team.  (Id. ¶ 67.)

11        On November 7, 2014, Videckis received a letter from the Title

12   IX coordinator.  (Id. ¶ 68.)  The letter stated that there was

13   insufficient evidence to conclude that harassment or sexual

14   orientation discrimination had occurred, and further that according

15   to the team doctor, Dr. Green had not received the documentation

16   necessary to assess Videckis's fitness to play basketball.  (Id.)

17   On December 1, 2014, Videckis sent the university a doctor's note

18   stating that "[i]t is acceptable for [Videckis] to return to

19   basketball without restriction."  (Id. ¶ 69.)  Neither Videckis nor

20   White were ever cleared to play basketball.  (Id.)

21        Plaintiffs previously filed a First Amended Complaint ("FAC")

22   that included a discrimination claim under Title IX.  (Dkt. No.

23   11.)  Pepperdine moved to dismiss the FAC and argued that Title IX

24   did not cover claims based on sexual orientation discrimination.

25   (Dkt. No. 13.)  Plaintiffs, in their opposition to the motion,

26   asked for leave to amend their Title IX cause of action.  (Dkt. No.

27   20.)  The Court granted Pepperdine's motion, although it noted that

28   it was inclined to find that Title IX did cover the types of

1 | actions alleged in the FAC.  (Dkt. No. 25.)  Plaintiffs have now
2 | filed a TAC.

3 |   Plaintiffs' TAC alleges seven causes of action: (1) violation
4 | of the right of privacy under the California Constitution; (2)
5 | violation of California Educational Code §§ 220, 66251, and 66270;
6 | (3) violation of Title IX - deliberate indifference; (4) violation
7 | of Title IX - intentional discrimination; (5) violation of Title IX
8 | - retaliation for complaints against discrimination; (6) violation
9 | of the Unruh Act, California Civil Code §§ 51 _et seq._; and (7)
10 | intentional infliction of emotional distress.  (_See generally_ TAC.)
11 | Pepperdine now moves to dismiss Plaintiffs' third, fourth, and
12 | fifth causes of action for failure to state a claim and moves to
13 | dismiss the claim for prejudgment interest.  (_See generally_ MTD.)

## II.   LEGAL STANDARD

15 |   A 12(b)(6) motion to dismiss requires the court to determine
16 | the sufficiency of the plaintiff's complaint and whether or not it
17 | contains a "short and plain statement of the claim showing that the
18 | pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under
19 | Rule 12(b)(6), a court must (1) construe the complaint in the light
20 | most favorable to the plaintiff, and (2) accept all well-pleaded
21 | factual allegations as true, as well as all reasonable inferences
22 | to be drawn from them.  _See_ _Sprewell v. Golden State Warriors_, 266
23 | F.3d 979, 988 (9th Cir. 2001), _amended on denial of reh'g_, 275 F.3d
24 | 1187 (9th Cir. 2001); _Pareto v. F.D.I.C._, 139 F.3d 696, 699 (9th
25 | Cir. 1998).

26 |   In order to survive a 12(b)(6) motion to dismiss, the
27 | complaint must "contain sufficient factual matter, accepted as
28 | true, to 'state a claim to relief that is plausible on its face.'"

1    Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.

2    Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  However,

3    "[t]hreadbare recitals of the elements of a cause of action,

4    supported by mere conclusory statements, do not suffice."  Iqbal,

5    556 U.S. at 678.  Dismissal is proper if the complaint "lacks a

6    cognizable legal theory or sufficient facts to support a cognizable

7    legal theory."  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d

8    1097, 1104 (9th Cir. 2008); see also Twombly, 550 U.S. at 561-63

9    (dismissal for failure to state a claim does not require the

10   appearance, beyond a doubt, that the plaintiff can prove "no set of

11   facts" in support of its claim that would entitle it to relief).  A

12   complaint does not "suffice if it tenders 'naked assertion[s]'

13   devoid of 'further factual enhancement.'"  Iqbal, 556 U.S. at 678

14   (quoting Twombly, 550 U.S. at 557).  "A claim has facial

15   plausibility when the plaintiff pleads factual content that allows

16   the court to draw the reasonable inference that the defendant is

17   liable for the misconduct alleged."  Id.  The Court need not accept

18   as true "legal conclusions merely because they are cast in the form

19   of factual allegations."  Warren v. Fox Family Worldwide, Inc., 328

20   F.3d 1136, 1139 (9th Cir. 2003).

21   **III.   DISCUSSION**

22        Pepperdine advances three main arguments in support of its

23   motion to dismiss Plaintiffs' three Title IX causes of action:

24   first, that Title IX does not apply to claims based on sexual

25   orientation discrimination; second, that Plaintiffs' allegations do

26   not support a Title IX claim based on gender stereotype

27   discrimination; and third, that the Title IX claims should be

28   dismissed because they are uncertain and not legally cognizable.

1  (MTD at 5-22, 24-25.)  Pepperdine also contends that the fifth

2  cause of action, for retaliation under Title IX, fails because

3  Plaintiffs have not alleged any actionable retaliation.  (Id. at

4  22-24.)  Finally, Pepperdine moves to dismiss the "claim for

5  prejudgment interest."  (Id. at 25.)

6      **A.  Plaintiffs' Third, Fourth, and Fifth Claims Under Title IX**

7      Title IX provides, in relevant part, that "[n]o person in the

8  United States shall, on the basis of sex . . . be subjected to

9  discrimination under any education program or activity receiving

10 Federal financial assistance."  20 U.S.C. § 1681(a).  Congress

11 enacted Title IX with the twin objectives of avoiding the use of

12 federal resources to support discriminatory practices and providing

13 individual citizens effective protection against those practices.

14 Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286 (1998).

15     In interpreting Title IX, courts often look to interpretations

16 of Title VII for reference.  See, e.g., Franklin v. Gwinnett Cnty.

17 Pub. Sch., 503 U.S. 60, 75 (1992).  The Ninth Circuit has held that

18 the legislative history of Title IX "strongly suggests that

19 Congress meant for similar substantive standards to apply under

20 Title IX as had been developed under Title VII."  Emeldi v. Univ.

21 of Oregon, 698 F.3d 715, 724 (9th Cir. 2012).

22     Title IX's prohibition of discrimination "on the basis of sex"

23 encompasses both sex - in the biological sense - as well as gender.

24 Schwenk v. Hartford, 204 F.3d 1187, 1202 (9th Cir. 2000).

25 Furthermore, discrimination based on gender stereotypes constitutes

26 discrimination on the basis of sex under Title VII.  Price

27 Waterhouse v. Hopkins, 490 U.S. 228, 250-51 (1989); Nichols v.

28 Azteca Rest. Enters., Inc., 256 F.3d 864, 874-75 (9th Cir.

11

2001)(holding that discrimination against either a man or a woman on the basis of gender stereotypes is prohibited).  In <u>Nichols</u>, the Ninth Circuit held that a male restaurant employee who was discriminated against at work for, among other things, walking "like a woman" and not having sexual intercourse with a female waitress friend had established an actionable claim for sexual harassment under Title VII.  <u>Nichols</u>, 256 F.3d at 874-75.

Plaintiffs in this case argue that they have stated an actionable Title IX claim because Title IX covers sexual orientation discrimination, and even if Title IX does not explicitly cover sexual orientation discrimination, the actions alleged in the TAC constitute gender stereotype discrimination. (Opp'n to MTD, Dkt. No. 34, at 6-13.)  Further, they argue that the TAC alleges a straightforward claim of discrimination on the basis of sex.  (<u>Id.</u>)

## 1. Sexual Orientation Discrimination

This Court, in its prior order dismissing in part Plaintiffs' FAC, stated that "the line between discrimination based on gender stereotyping and discrimination based on sexual orientation is blurry, at best." (Dkt. No. 25.)  After further briefing and argument, the Court concludes that the distinction is illusory and artificial, and that  sexual orientation discrimination is not a category distinct from sex or gender discrimination.  Thus, claims of discrimination based on sexual orientation are covered by Title VII and IX, but not as a category of independent claims separate from sex and gender stereotype.  Rather, claims of sexual orientation discrimination are gender stereotype or sex discrimination claims.

12

1    Other courts have acknowledged the difficulty of

2  distinguishing sexual orientation discrimination from

3  discrimination based on sex or gender stereotypes.  See, e.g.,

4  Prowel v. Wise Bus. Forms, Inc., 579 F.3d 285, 291 (3d Cir. 2009)

5  (stating that "the line between sexual orientation discrimination

6  and discrimination 'because of sex' can be difficult to draw");

7  Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005)

8  (acknowledging that it would be difficult to determine if an

9  actionable Title VII claim was stated when a plaintiff stated she

10 was discriminated against based on her sex, her failure to conform

11 to gender norms, and her sexual orientation, because "the borders

12 [between these classes] are so imprecise" (alteration in

13 original)); Centola v. Potter, 183 F. Supp. 2d 403, 408 (D. Mass.

14 2002)(acknowledging that "the line between discrimination because

15 of sexual orientation and discrimination because of sex is hardly

16 clear").  Simply put, the line between sex discrimination and

17 sexual orientation discrimination is "difficult to draw" because

18 that line does not exist, save as a lingering and faulty judicial

19 construct.

20    Pepperdine cites to opinions from various federal courts that

21 state categorically that sexual orientation discrimination is not

22 covered under Title IX.  (See MTD at 6-14.)  However, the Ninth

23 Circuit has held only that "an employee's sexual orientation is

24 irrelevant for purposes of Title VII," and that "[i]t neither

25 provides nor precludes a cause of action for sexual harassment."

26 Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1063 (9th Cir. 2002)

27

28

1  (en banc) (plurality opinion).[1]  Furthermore, the cases upon which

2  Pepperdine relies, for the most part, dismiss analogous sexual

3  orientation-based claims in a cursory and conclusory fashion.  See,

4  e.g., Johnson v. Eckstrom, No. C-11-2052 EMC, 2011 WL 5975039, at

5  *5 (N.D. Cal. Nov. 29, 2011) (stating, simply, that "neither Title

6  VII nor any other federal law protects against discrimination on

7  the basis of sexual orientation").  The Court rejects the reasoning

8  of these cases, which do not fully evaluate the nature of claims

9  based on sexual orientation discrimination.

10      In sexual orientation discrimination cases, focusing on the

11  actions or appearance of the alleged victim of discrimination

12  rather than the bias of the alleged perpetrator asks the wrong

13  question and compounds the harm.  A plaintiff's "actual" sexual

14  orientation is irrelevant to a Title IX or Title VII claim because

15  it is the biased mind of the alleged discriminator that is the

16  focus of the analysis.  This is especially true given that

17  sexuality cannot be defined on a homosexual or heterosexual basis;

18  it exists on a continuum.  See Kenji Yoshino, The Epistemic

19  Contract of Bisexual Erasure, 52 Stan. L. Rev. 353, 380-81 (2000)

20  (discussing the "Kinsey scale," which conceived of sexual

21  orientation as a continuum with six ratings).  It is not the victim

22  of discrimination who should be forced to put his or her sexual

23  orientation on trial.  We do not demand of a victim of alleged

24

25      [1] The concurring judges only joined in the result of the
    plurality opinion, as the concurrences would have found "actionable
26  gender stereotyping harassment."  See Rene, 305 F.3d at 1068
    (Pregerson, Trott, and Berzon, JJ., concurring); id. at 1069-70
27  (Graber, J., concurring) (finding facts indistinguishable from
    Oncale v. Sundowner Offshore Servs., Inc., 532 U.S. 75 (1998),
28  where the Court held same sex harassment was covered by Title VII);
    id. at 1070 (Fisher, J., concurring).

religious discrimination, "Prove that you are a *real* Catholic,
Mormon, or Jew."  Just as it would be absurd to demand that a
victim of alleged racial discrimination prove he is black, it is
absurd to demand a victim of alleged sex discrimination based on
sexual orientation prove she is a lesbian.  The contrary view would
turn a Title IX trial into a broad inquisition into the personal
sexual history of the victim.  Such an approach should be precluded
as not only highly inflammatory and offensive, but also irrelevant
for the purposes of the Title IX discrimination analysis.

Therefore, the Court finds that sexual orientation
discrimination is a form of sex or gender discrimination, and that
the "actual" orientation of the victim is irrelevant.  It is
impossible to categorically separate "sexual orientation
discrimination" from discrimination on the basis of sex or from
gender stereotypes; to do so would result in a false choice.
Simply put, to allege discrimination on the basis of sexuality is
to state a Title IX claim on the basis of sex or gender.

### 2.  Gender Stereotype Discrimination

It is undisputed that Title IX forbids discrimination on the
basis of gender stereotypes.  Gender stereotyping is a concept that
sweeps broadly.  <u>See</u> <u>Price Waterhouse</u>, 490 U.S. at 251 ("[W]e are
beyond the day when an employer could evaluate employees by
assuming or insisting that they matched the stereotype associated
with their group, for '[i]n forbidding employers to discriminate
against individuals because of their sex, Congress intended to
strike at the entire spectrum of disparate treatment of men and
women resulting from sex stereotypes.'") (quoting <u>Los Angeles Dep't</u>
<u>of Water & Power v. Manhart</u>, 435 U.S. 702, 707 n.13 (1978)).  As

15

1   discussed above, discrimination based on gender stereotyping

2   encompasses sexual orientation discrimination.

3       Plaintiffs allege here that they were discriminated against

4   because of the Pepperdine women's basketball staff's belief that

5   Plaintiffs were lesbian.  Plaintiffs also allege that the staff's

6   stereotypes about lesbians and lesbianism formed the basis of the

7   staff's harassment.  (TAC ¶ 19.)

8       The type of sexual orientation discrimination Plaintiffs

9   allege falls under the broader umbrella of gender stereotype

10  discrimination.  Stereotypes about lesbianism, and sexuality in

11  general, stem from a person's views about the proper roles of men

12  and women – and the relationships between them.  Discrimination

13  based on a perceived failure to conform to a stereotype constitutes

14  actionable discrimination under Title IX.  See Centola, 183 F.

15  Supp. 2d at 410 ("Conceivably, a plaintiff who is perceived by his

16  harassers as stereotypically masculine in every way except for his

17  actual or perceived sexual orientation could maintain a Title VII

18  cause of action alleging sexual harassment because of his sex due

19  to his failure to conform with sexual stereotypes about what 'real'

20  men do or don't do.").

21      Here, Plaintiffs allege that they were repeatedly harassed and

22  treated differently from other similarly situated individuals

23  because of their perceived sexual orientation.  Coaches, trainers,

24  and support staff repeatedly queried Plaintiffs about their sexual

25  orientation, their private sexual behavior, and their dating lives.

26  Plaintiffs allege that they were told lesbianism would not be

27  tolerated on the women's basketball team.  Plaintiffs further

28  allege that they were not cleared to play basketball because of

Pepperdine's discriminatory views against lesbianism.  If the women's basketball staff in this case had a negative view of lesbians based on lesbians' perceived failure to conform to the staff's views of acceptable female behavior, actions taken on the basis of these negative biases would constitute gender stereotype discrimination.  Consequently, Plaintiffs have stated a claim for discrimination because they allege that Pepperdine treated them differently due to their perceived lack of conformity with gender stereotypes, and further that Pepperdine discriminated against them based on stereotypes about lesbianism.

### 3. Sex Discrimination

In addition to stating a claim based on gender stereotyping discrimination, Plaintiffs have stated a claim that they were discriminated against because of their sex.  Discrimination on the basis of sex can be defined as treating someone differently simply because that person's sex is different from a similarly situated person of the opposite sex.  See Manhart, 435 U.S. at 711 (applying the "simple test of whether the evidence shows treatment of a person in a manner which but for that person's sex would be different" (internal quotation marks omitted)); Oncale, 523 U.S. at 80 (describing the "critical issue" under Title VII as whether the discrimination would have occurred if the sex of the victim had been different).

Here, Plaintiffs allege that they were told that "lesbianism" would not be tolerated on the team.  If Plaintiffs had been males dating females, instead of females dating females, they would not have been subjected to the alleged different treatment.  Plaintiffs have stated a straightforward claim of sex discrimination under

17

1    Title IX.  <u>Cf.</u> <u>Latta v. Otter</u>, 771 F.3d 456, 480 (9th Cir.

2    2014)(Berzon, J., concurring)(finding same-sex marriage bans were

3    facially discriminatory on the basis of sex because the bans

4    dictated who could marry who based on the sex of the marriage

5    participants).

6         This Court's conclusion is in line with a recent Equal

7    Employment Opportunity Commission ("EEOC") decision holding that

8    sexual orientation discrimination is covered under Title VII, and

9    therefore that the EEOC will treat sexual orientation

10   discrimination claims the same as other sex discrimination claims

11   under Title VII.  <u>Baldwin v. Anthony Foxx, Sec'y, Dep't of Transp.</u>,

12   EEOC Appeal No. 0120133080, 2015 WL 4397641, at *10, (EEOC July 16,

13   2015) (holding that "allegations of discrimination on the basis of

14   sexual orientation necessarily state a claim of discrimination on

15   the basis of sex").  The EEOC concluded that "[a]n employee could

16   show that the sexual orientation discrimination he or she

17   experienced was sex discrimination because it involved treatment

18   that would not have occurred but for the individual's sex; because

19   it was based on the sex of the person(s) the individual associates

20   with; and/or because it was premised on the fundamental sex

21   stereotype, norm, or expectation that individuals should be

22   attracted only to those of the opposite sex."  <u>Id.</u>  For these

23   reasons, as well as for the reasons stated in this Order, this

24   Court agrees.

25        **B.  Plaintiffs' Title IX Retaliation Claim**

26        Pepperdine further argues that Plaintiffs' fifth cause of

27   action, for retaliation under Title IX, must be dismissed because

28

                                    18

1  Plaintiffs have not alleged facts establishing a prima facie case
2  of retaliation.
3      Under Title IX, "a plaintiff who lacks direct evidence of
4  retaliation must first make out a prima facie case of retaliation
5  by showing (a) that he or she was engaged in protected activity,
6  (b) that he or she suffered an adverse action, and (c) that there
7  was a causal link between the two." Emeldi, 698 F.3d at 724.  In
8  order to make out a prima facie case, a plaintiff "need only make a
9  minimal threshold showing of retaliation."  Id.
10     Here, Plaintiffs have clearly pled a plausible claim for
11 retaliation.  Plaintiffs were engaged in protected activity.  They
12 complained to the coaching staff and Pepperdine's Title IX
13 coordinator about the harassment they suffered.  See Jackson v.
14 Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005) ("Retaliation
15 against a person because that person has complained of sex
16 discrimination is another form of intentional sex discrimination
17 encompassed by Title IX's private cause of action.").  Furthermore,
18 Plaintiffs allege various retaliatory actions they experienced as a
19 result of their complaints. (See, e.g., TAC ¶¶ 34-36, 63-69.)
20 They allege that, ultimately, they were forced off the basketball
21 team and lost their scholarships.
22     Pepperdine argues that because Plaintiffs tried to hide their
23 relationship status, they therefore never could have made a
24 complaint about discrimination.  This argument is without merit.
25 Plaintiffs clearly allege that they complained to the coaching
26 staff and school officials about the intrusive questioning and
27 harassment to which they were subjected.  The fact that Plaintiffs
28 may never have explicitly told school officials that they were

1   dating is irrelevant to whether they complained that they were
2   being harassed.  Again, requiring that Plaintiffs disclose their
3   sexual orientation or relationship status improperly focuses the
4   inquiry on the status of the victim rather than the bias of the
5   alleged harasser, and imposes a burden that Title IX does not
6   contemplate.

7       **C.  Uncertainty of Plaintiffs' Third, Fourth, and Fifth Causes
            of Action**
8

9       Pepperdine asserts that because Plaintiffs have chosen to
10  plead their Title IX theories under three separate causes of
11  action, this format renders Plaintiffs' Title IX claims "uncertain
12  and not legally cognizable."  (See MTD at 24-25.)  Pepperdine's
13  argument is unavailing in light of the liberal pleading standards
14  of Federal Rule of Civil Procedure 8.  Although Plaintiffs could
15  have pled their Title IX claims as a single cause of action, the
16  fact that they included them as three separate causes of action
17  does not require dismissal.  Under Rule 8, all that is required is
18  that the complaint must contain "a short and plain statement of the
19  claim showing that the pleader is entitled to relief."  Fed. R.
20  Civ. P. 8(a)(2).  In fact, Rule 8 expressly states that "[n]o
21  technical form is required" for pleadings, and further that "[a]
22  party may set out 2 or more statements of a claim or defense
23  alternatively or hypothetically, either in a single count or
24  defense or in separate ones."  Fed. R. Civ. P. 8(d).  Accordingly,
25  Plaintiffs' third, fourth, and fifth claims are not "legally
26  uncognizable" or "uncertain," and cannot be dismissed for such a
27  reason.
28  ///

**D.  Prayer for Prejudgment Interest**

Pepperdine also moves to dismiss Plaintiffs' prayer for prejudgment interest.  Strictly speaking, Plaintiffs' request for prejudgment interest is contained in their "Relief Requested" rather than pled as a separate claim, and thus a motion to dismiss under Rule 12(b)(6) is the improper vehicle to use in arguing against prejudgment interest.  Instead, Pepperdine should have moved to strike the prayer for prejudgment interest.  <u>See</u> Fed. R. Civ. P. 12(f).  The Court will treat Pepperdine's motion as a motion to strike with respect to the prayer for prejudgment interest.

Plaintiffs argue that, at this stage of the proceedings, because the nature of their claims remain "in flux," the Court should defer ruling on the issue of prejudgment interest until a later point in the case.  Plaintiffs have not responded to Pepperdine's substantive arguments.

California Civil Code Sections 3287 and 3288 govern awards of prejudgment interest.  Pepperdine contends that Plaintiffs are not entitled to prejudgment interest on their state law claims because the damages involved are for "the intangible, noneconomic aspects of mental and emotional injury." <u>Greater Westchester Homeowners Assn. v. City of Los Angeles</u>, 26 Cal. 3d 86, 103 (1979).  However, the damages involved in the present case may go beyond mental and emotional injury.  Plaintiffs allege that, due to Pepperdine's actions, Plaintiffs were forced off the women's basketball team, had their scholarships revoked, and withdrew from the school.  (TAC ¶¶ 76-79, 136.)  Damages from these types of injuries may be tangible and economic, and thus eligible for prejudgment interest

1  under Section 3288.  Accordingly, the request for prejudgment

2  interest will not be stricken.

3  **IV.   CONCLUSION**

4      For the foregoing reasons, the Court DENIES Pepperdine's

5  motion to dismiss Plaintiffs' third, fourth, and fifth causes of

6  action and prayer for prejudgment interest.

7

8

9  IT IS SO ORDERED.

10

11

12  Dated: December 14, 2015

13                                    DEAN D. PREGERSON
                                     United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28