O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HALEY VIDECKIS AND LAYANA WHITE, | ) | Case No. CV 15-00298 DDP (JCx) |
| | ) | |
| Plaintiffs, | ) | **AMENDED ORDER DENYING DEFENDANT** |
| | ) | **PEPPERDINE UNIVERSITY'S MOTION TO** |
| v. | ) | **DISMISS THIRD, FOURTH, AND FIFTH** |
| | ) | **CAUSES OF ACTION OF THE THIRD** |
| PEPPERDINE UNIVERSITY, a | ) | **AMENDED COMPLAINT** |
| corporation doing business | ) | |
| in California, | ) | [AMENDED AS TO TYPOGRAPHICAL |
| | ) | ERROR IN ORIGINAL CAPTION ONLY] |
| Defendant. | ) | |
| | ) | [Dkt. No. 33] |
| _____ | ) | |

Presently before the Court is Defendant Pepperdine University ("Pepperdine")'s Motion to Dismiss the Third, Fourth and Fifth Causes of Action of the Third Amended Complaint and Prayer for Prejudgment Interest Pursuant to Fed. R. Civ. P. 12(b)(6) ("MTD"). (Dkt. No. 33.)  Having considered the parties' submissions and heard oral argument, the Court DENIES the motion and adopts the following order.

///

///

///

## I.   BACKGROUND

Plaintiffs in this case are Haley Videckis ("Videckis") and Layana White ("White").  Videckis is a former member of Pepperdine's women's basketball team who transferred to Pepperdine from Arizona State University in July 2013.  (Third Amended Complaint ("TAC"), Dkt. No. 31, ¶¶ 1, 47.)  White is also a former member of Pepperdine's women's basketball team who transferred to Pepperdine from Arizona State University in January 2014.  (TAC ¶¶ 2, 47.)  Defendant Pepperdine is a university located in California.  (Id. ¶ 3.)  Pepperdine receives funds from the federal government and from the state of California.  (Id.)  Ryan Weisenberg ("Coach Ryan") is the head coach of the Pepperdine women's basketball team.  (Id. ¶ 7.)  Adi Conlogue ("Conlogue") is an athletic academic coordinator of the Pepperdine women's basketball team.  (Id. ¶ 13.)

Plaintiffs' suit arises out of allegedly intrusive and discriminatory actions that Pepperdine and its employees committed against Plaintiffs on account of Plaintiffs' dating relationship. Plaintiffs allege that, in the spring of 2014, Coach Ryan and others on the staff of the women's basketball team came to the conclusion that Plaintiffs were lesbians and were in a lesbian relationship.  (Id. ¶ 17.)  Plaintiffs further allege that Coach Ryan and the coaching staff were concerned about the possibility of the relationship causing turmoil within the team.  (Id.) Plaintiffs allege that, due to their concerns, Coach Ryan and members of the coaching staff harassed and discriminated against Plaintiffs in an effort to force Plaintiffs to quit the team. (Id.)

1    Plaintiffs allege that, beginning in February 2014, Conlogue
2 would hold individual meetings with each of the Plaintiffs in order
3 to determine Plaintiffs' sexual orientation and their relationship
4 status. (Id. ¶¶ 19-22.)  During these meetings Conlogue
5 specifically asked Plaintiffs whether there were any gay or
6 bisexual players on the women's basketball team. (Id. ¶ 21.)
7 Conlogue would ask follow-up questions consisting of, among other
8 things, how close Plaintiffs were, whether they took vacations
9 together, where they slept, whether they pushed their beds
10 together, whether they went on dates, and whether they would live
11 together. (Id. ¶ 22)  The questioning lasted at least through June
12 2014. (Id. ¶ 25.)

13    At the end of April, White reported to Coach Ryan that
14 Conlogue was constantly trying to obtain information about White's
15 personal life instead of focusing on White's academics. (Id. ¶
16 28.)  Coach Ryan assured White that he would soon have a coach
17 monitor the players' meetings with Conlogue, as other teammates had
18 also complained about Conlogue not focusing on academics. (Id.)
19 Plaintiffs allege that Coach Ryan did not take any action to stop
20 Conlogue's inquiries into their personal lives. (Id.)  Plaintiffs
21 further allege that Conlogue's persistent questioning during study
22 hall deprived them of educational opportunities that other
23 students, similarly situated at Pepperdine, received. (Id.)

24    On April 16, 2014, Coach Ryan held a team leadership meeting
25 where he spoke on the topic of lesbianism. (Id. ¶ 27.)  In the
26 meeting, Coach Ryan stated that lesbianism was a big concern for
27 him and for women's basketball, that it was a reason why teams
28 lose, and that it would not be tolerated on the team. (Id.)

1  In May 2014, White met with Coach Ryan to discuss filing an
2  appeal to the NCAA that would allow her to play basketball in her
3  first year as a transfer student.  (<u>Id.</u> ¶ 33.)  Coach Ryan assured
4  White that he would be starting the process right away.  (<u>Id.</u>)
5  Afterwards, however, White received no updates on the progress of
6  the appeal.  (<u>Id.</u>)  On June 12, 2014 White met with the Pepperdine
7  athletic director, Dr. Steve Potts ("Dr. Potts"), at Pepperdine,
8  and learned that Dr. Potts had not been informed of any appeal on
9  her behalf.  (<u>Id.</u> ¶ 36.)

10  White alleges that Dr. Potts offered to process the appeal for
11  her, but that she still has not received a follow up on the status
12  of her appeal.  (<u>Id.</u>)  White further alleges that another male
13  basketball player who transferred to Pepperdine was approved to
14  play in 2015 immediately after transferring despite the fact that
15  White was admitted to Pepperdine before the male player.  (<u>Id.</u>)

16  On June 4, 2014, Videckis complained to the coaching staff
17  that Karissa Scherer ("Scherer"), an athletic trainer, had been
18  asking Videckis inappropriate questions about dating women.  (<u>Id.</u>)
19  Additionally, Plaintiffs claim that Scherer falsely accused them of
20  breaking the training room rules.  (<u>Id.</u> ¶ 34.)  Videckis alleges
21  that Coach Ryan accused her of lying when she complained about the
22  inappropriate questions.  (<u>Id.</u>)  However, the next day Scherer
23  admitted to Coach Ryan that she did ask Videckis inappropriate
24  questions about her sexual orientation, and Coach Ryan required the
25  athletic trainer to apologize to Videckis.  (<u>Id.</u> ¶ 35.)  Coach Ryan
26  ignored Scherer's accusations against Videckis for breaking the
27  training room rules.  (<u>Id.</u>)  A Title IX investigation confirmed
28

1  that Scherer improperly changed the time records so that Videckis
2  and White appeared to arrive late to their training.  (Id.)

3      Plaintiffs further allege that, in early July, Conlogue
4  falsely accused Plaintiffs of academic cheating.  (Id. ¶ 41.)
5  Plaintiffs allege that there was no evidence to substantiate
6  Conlogue's claim, and the charges were later dropped.  (Id.)  Later
7  in July, Coach Ryan reached out to two of Plaintiffs' teammates,
8  recommended that the teammates not live with Plaintiffs, and stated
9  that Plaintiffs were bad influences.  (Id.)  One of those teammates
10 subsequently came forward to Plaintiffs, informing them that Coach
11 Ryan was trying to turn the other players on the team against them.
12 (Id.)

13     On August 26, 2014, Coach Ryan and another member of the
14 coaching staff asked two of Plaintiffs' teammates whether
15 Plaintiffs were dating.  (Id. ¶ 42.)  When Plaintiffs found out
16 that the coaches had been asking their teammates about Plaintiffs'
17 relationship status, White confronted Coach Ryan about the
18 questioning.  (Id.)  During this meeting, White was able to confirm
19 that the coaching staff had been asking teammates whether
20 Plaintiffs were dating.  (Id.)

21     At some time during the semester, White raised her GPA to a
22 3.0, which under the team rules allowed her to attend study hall
23 for fewer hours.  (Id. ¶ 39.)  White alleges that Coach Ryan
24 immediately changed the team rule to require a minimum GPA of 3.2
25 instead of 3.0, in an effort to force White to interact with
26 Conlogue in study hall.  (Id.)

27     In early September 2014, Conlogue and the coaching staff
28 accused White of being absent from a required study hall and

punished White.  (<u>Id.</u> ¶ 44.)  After the meeting where Coach Ryan and Conlogue issued White's punishment, Conlogue walked up to White with a book White needed and slammed the book on the desk in front of White.  (<u>Id.</u>)  That night, White attempted to commit suicide. (<u>Id.</u>)

In June 2014, Videckis reported to Scherer that she was experiencing pain in her tailbone that she believed stemmed from basketball training, but that the injury would not affect her ability to play basketball.  (<u>Id.</u> ¶ 48.)  Videckis saw two separate doctors, neither of whom restricted her ability to play basketball. (<u>Id.</u>)

On September 9, 2014, Videckis informed Coach Ryan that she would miss practice on September 12 because she was getting tested for cervical cancer.  (<u>Id.</u> ¶ 53.)  Videckis alleges that Scherer requested her gynecological records, but that she refused to give Pepperdine access because those records were unrelated to her ability to play basketball.  (<u>Id.</u> ¶ 54.) Plaintiffs allege that no other women or men on the basketball teams were asked to provide similar medical records.  (<u>Id.</u>)

On September 16, 2014, Videckis met with Dr. Green at the Pepperdine Health Center, who told her that she was cleared for her condition.  (<u>Id.</u> ¶ 56.)  After leaving her appointment that day, Videckis received an email from Scherer that stated Videckis would not be cleared for participation unless she provided the athletic medicine center with documentation from a spine specialist relating to her tailbone injury.  (<u>Id.</u> ¶ 57.)

On September 17, Videckis called the health center to request documentation.  (<u>Id.</u>)  That same day, Videckis brought her "MRI,

diagnosis, and treatment of prescription" to the athletic training room. (Id. ¶ 58.)   Afterwards, Videckis received emails from the athletic trainers informing her that the documentation she provided was insufficient, and that she needed to provide them with a diagnosis and treatment plan. (Id. ¶ 59.)   Videckis spoke with Coach Ryan, telling him that she had given the trainers all of the documentation the doctor's office had on file for her. (Id. ¶ 61.) Videckis requested Coach Ryan's assistance in speaking with the trainers to clear her for her tailbone injury, but Coach Ryan informed Videckis that he would not help her. (Id.)   Videckis replied to the emails, informing the trainers that her diagnosis was in the documentation she had provided, but received no response. (Id.)

On September 19, 2014, Videckis met with Dr. Potts, the Pepperdine athletic director, and told him of her concerns regarding unfair treatment by the women's basketball staff. (Id.) Videckis told Dr. Potts that she felt that the coaching staff was trying to keep her and White from playing, and furthermore that they were trying to get Plaintiffs kicked out of the school. (Id. ¶ 64.)   Videckis alleges that Dr. Potts was very rude during the meeting and also that he yelled at her for bringing the issue to his attention. (Id.)

That same day, Videckis called Coach Ryan and told him that she was very unhappy with the way she had been treated. (Id.) Coach Ryan then told her that she would need to make a decision as to whether she wanted to remain on the team by Sunday. (Id.) Videckis told him that she would need until Monday. (Id.)   On Monday, Videckis called Coach Ryan and told him that she needed

more time.  (Id.)  In response, Coach Ryan told her that he needed her decision by 5pm that day; otherwise, he would tell Dr. Potts that Videckis had quit voluntarily.  (Id. ¶ 65.)

Videckis sent Dr. Potts an email on September 24, stating that she had not made a decision to quit, and that she would like to speak with Dr. Potts later that week when she was back in town.  (Id. ¶ 66.)  Dr. Potts replied, saying that due to Videckis' concerns, the school had begun an investigation, and that until then, as requested, Videckis would be relieved from activities having to do with the basketball team.  (Id. ¶ 67.)

On November 7, 2014, Videckis received a letter from the Title IX coordinator.  (Id. ¶ 68.)  The letter stated that there was insufficient evidence to conclude that harassment or sexual orientation discrimination had occurred, and further that according to the team doctor, Dr. Green had not received the documentation necessary to assess Videckis's fitness to play basketball.  (Id.)  On December 1, 2014, Videckis sent the university a doctor's note stating that "[i]t is acceptable for [Videckis] to return to basketball without restriction."  (Id. ¶ 69.)  Neither Videckis nor White were ever cleared to play basketball.  (Id.)

Plaintiffs previously filed a First Amended Complaint ("FAC") that included a discrimination claim under Title IX.  (Dkt. No. 11.)  Pepperdine moved to dismiss the FAC and argued that Title IX did not cover claims based on sexual orientation discrimination. (Dkt. No. 13.)  Plaintiffs, in their opposition to the motion, asked for leave to amend their Title IX cause of action.  (Dkt. No. 20.)  The Court granted Pepperdine's motion, although it noted that it was inclined to find that Title IX did cover the types of

1  actions alleged in the FAC.  (Dkt. No. 25.)  Plaintiffs have now

2  filed a TAC.

3      Plaintiffs' TAC alleges seven causes of action: (1) violation

4  of the right of privacy under the California Constitution; (2)

5  violation of California Educational Code §§ 220, 66251, and 66270;

6  (3) violation of Title IX - deliberate indifference; (4) violation

7  of Title IX - intentional discrimination; (5) violation of Title IX

8  - retaliation for complaints against discrimination; (6) violation

9  of the Unruh Act, California Civil Code §§ 51 et seq.; and (7)

10  intentional infliction of emotional distress.  (See generally TAC.)

11  Pepperdine now moves to dismiss Plaintiffs' third, fourth, and

12  fifth causes of action for failure to state a claim and moves to

13  dismiss the claim for prejudgment interest.  (See generally MTD.)

14  **II.  LEGAL STANDARD**

15      A 12(b)(6) motion to dismiss requires the court to determine

16  the sufficiency of the plaintiff's complaint and whether or not it

17  contains a "short and plain statement of the claim showing that the

18  pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under

19  Rule 12(b)(6), a court must (1) construe the complaint in the light

20  most favorable to the plaintiff, and (2) accept all well-pleaded

21  factual allegations as true, as well as all reasonable inferences

22  to be drawn from them.  See Sprewell v. Golden State Warriors, 266

23  F.3d 979, 988 (9th Cir. 2001), amended on denial of reh'g, 275 F.3d

24  1187 (9th Cir. 2001); Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th

25  Cir. 1998).

26      In order to survive a 12(b)(6) motion to dismiss, the

27  complaint must "contain sufficient factual matter, accepted as

28  true, to 'state a claim to relief that is plausible on its face.'"

1  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.

2  Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  However,

3  "[t]hreadbare recitals of the elements of a cause of action,

4  supported by mere conclusory statements, do not suffice." Iqbal,

5  556 U.S. at 678.  Dismissal is proper if the complaint "lacks a

6  cognizable legal theory or sufficient facts to support a cognizable

7  legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d

8  1097, 1104 (9th Cir. 2008); see also Twombly, 550 U.S. at 561-63

9  (dismissal for failure to state a claim does not require the

10 appearance, beyond a doubt, that the plaintiff can prove "no set of

11 facts" in support of its claim that would entitle it to relief).  A

12 complaint does not "suffice if it tenders 'naked assertion[s]'

13 devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678

14 (quoting Twombly, 550 U.S. at 557).  "A claim has facial

15 plausibility when the plaintiff pleads factual content that allows

16 the court to draw the reasonable inference that the defendant is

17 liable for the misconduct alleged." Id.  The Court need not accept

18 as true "legal conclusions merely because they are cast in the form

19 of factual allegations." Warren v. Fox Family Worldwide, Inc., 328

20 F.3d 1136, 1139 (9th Cir. 2003).

21 **III.   DISCUSSION**

22      Pepperdine advances three main arguments in support of its

23 motion to dismiss Plaintiffs' three Title IX causes of action:

24 first, that Title IX does not apply to claims based on sexual

25 orientation discrimination; second, that Plaintiffs' allegations do

26 not support a Title IX claim based on gender stereotype

27 discrimination; and third, that the Title IX claims should be

28 dismissed because they are uncertain and not legally cognizable.

10

1   (MTD at 5-22, 24-25.)  Pepperdine also contends that the fifth

2   cause of action, for retaliation under Title IX, fails because

3   Plaintiffs have not alleged any actionable retaliation.  (Id. at

4   22-24.)  Finally, Pepperdine moves to dismiss the "claim for

5   prejudgment interest."  (Id. at 25.)

6       **A.  Plaintiffs' Third, Fourth, and Fifth Claims Under Title IX**

7       Title IX provides, in relevant part, that "[n]o person in the

8   United States shall, on the basis of sex . . . be subjected to

9   discrimination under any education program or activity receiving

10  Federal financial assistance."  20 U.S.C. § 1681(a).  Congress

11  enacted Title IX with the twin objectives of avoiding the use of

12  federal resources to support discriminatory practices and providing

13  individual citizens effective protection against those practices.

14  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286 (1998).

15      In interpreting Title IX, courts often look to interpretations

16  of Title VII for reference.  See, e.g., Franklin v. Gwinnett Cnty.

17  Pub. Sch., 503 U.S. 60, 75 (1992).  The Ninth Circuit has held that

18  the legislative history of Title IX "strongly suggests that

19  Congress meant for similar substantive standards to apply under

20  Title IX as had been developed under Title VII."  Emeldi v. Univ.

21  of Oregon, 698 F.3d 715, 724 (9th Cir. 2012).

22      Title IX's prohibition of discrimination "on the basis of sex"

23  encompasses both sex - in the biological sense - as well as gender.

24  Schwenk v. Hartford, 204 F.3d 1187, 1202 (9th Cir. 2000).

25  Furthermore, discrimination based on gender stereotypes constitutes

26  discrimination on the basis of sex under Title VII.  Price

27  Waterhouse v. Hopkins, 490 U.S. 228, 250-51 (1989); Nichols v.

28  Azteca Rest. Enters., Inc., 256 F.3d 864, 874-75 (9th Cir.

2001)(holding that discrimination against either a man or a woman on the basis of gender stereotypes is prohibited).  In <u>Nichols</u>, the Ninth Circuit held that a male restaurant employee who was discriminated against at work for, among other things, walking "like a woman" and not having sexual intercourse with a female waitress friend had established an actionable claim for sexual harassment under Title VII.  <u>Nichols</u>, 256 F.3d at 874-75.

Plaintiffs in this case argue that they have stated an actionable Title IX claim because Title IX covers sexual orientation discrimination, and even if Title IX does not explicitly cover sexual orientation discrimination, the actions alleged in the TAC constitute gender stereotype discrimination. (Opp'n to MTD, Dkt. No. 34, at 6-13.)  Further, they argue that the TAC alleges a straightforward claim of discrimination on the basis of sex.  (<u>Id.</u>)

### 1. Sexual Orientation Discrimination

This Court, in its prior order dismissing in part Plaintiffs' FAC, stated that "the line between discrimination based on gender stereotyping and discrimination based on sexual orientation is blurry, at best." (Dkt. No. 25.)  After further briefing and argument, the Court concludes that the distinction is illusory and artificial, and that  sexual orientation discrimination is not a category distinct from sex or gender discrimination.  Thus, claims of discrimination based on sexual orientation are covered by Title VII and IX, but not as a category of independent claims separate from sex and gender stereotype.  Rather, claims of sexual orientation discrimination are gender stereotype or sex discrimination claims.

1    Other courts have acknowledged the difficulty of
2 distinguishing sexual orientation discrimination from
3 discrimination based on sex or gender stereotypes.  See, e.g.,
4 Prowel v. Wise Bus. Forms, Inc., 579 F.3d 285, 291 (3d Cir. 2009)
5 (stating that "the line between sexual orientation discrimination
6 and discrimination 'because of sex' can be difficult to draw");
7 Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005)
8 (acknowledging that it would be difficult to determine if an
9 actionable Title VII claim was stated when a plaintiff stated she
10 was discriminated against based on her sex, her failure to conform
11 to gender norms, and her sexual orientation, because "the borders
12 [between these classes] are so imprecise" (alteration in
13 original)); Centola v. Potter, 183 F. Supp. 2d 403, 408 (D. Mass.
14 2002)(acknowledging that "the line between discrimination because
15 of sexual orientation and discrimination because of sex is hardly
16 clear").  Simply put, the line between sex discrimination and
17 sexual orientation discrimination is "difficult to draw" because
18 that line does not exist, save as a lingering and faulty judicial
19 construct.

20    Pepperdine cites to opinions from various federal courts that
21 state categorically that sexual orientation discrimination is not
22 covered under Title IX.  (See MTD at 6-14.)  However, the Ninth
23 Circuit has held only that "an employee's sexual orientation is
24 irrelevant for purposes of Title VII," and that "[i]t neither
25 provides nor precludes a cause of action for sexual harassment."
26 Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1063 (9th Cir. 2002)
27
28

(en banc) (plurality opinion).[1]  Furthermore, the cases upon which Pepperdine relies, for the most part, dismiss analogous sexual orientation-based claims in a cursory and conclusory fashion.  See, e.g., Johnson v. Eckstrom, No. C-11-2052 EMC, 2011 WL 5975039, at *5 (N.D. Cal. Nov. 29, 2011) (stating, simply, that "neither Title VII nor any other federal law protects against discrimination on the basis of sexual orientation").  The Court rejects the reasoning of these cases, which do not fully evaluate the nature of claims based on sexual orientation discrimination.

In sexual orientation discrimination cases, focusing on the actions or appearance of the alleged victim of discrimination rather than the bias of the alleged perpetrator asks the wrong question and compounds the harm.  A plaintiff's "actual" sexual orientation is irrelevant to a Title IX or Title VII claim because it is the biased mind of the alleged discriminator that is the focus of the analysis.  This is especially true given that sexuality cannot be defined on a homosexual or heterosexual basis; it exists on a continuum.  See Kenji Yoshino, The Epistemic Contract of Bisexual Erasure, 52 Stan. L. Rev. 353, 380-81 (2000) (discussing the "Kinsey scale," which conceived of sexual orientation as a continuum with six ratings).  It is not the victim of discrimination who should be forced to put his or her sexual orientation on trial.  We do not demand of a victim of alleged

---

[1] The concurring judges only joined in the result of the plurality opinion, as the concurrences would have found "actionable gender stereotyping harassment."  See Rene, 305 F.3d at 1068 (Pregerson, Trott, and Berzon, JJ., concurring); id. at 1069-70 (Graber, J., concurring) (finding facts indistinguishable from Oncale v. Sundowner Offshore Servs., Inc., 532 U.S. 75 (1998), where the Court held same sex harassment was covered by Title VII); id. at 1070 (Fisher, J., concurring).

1  religious discrimination, "Prove that you are a *real* Catholic,

2  Mormon, or Jew."  Just as it would be absurd to demand that a

3  victim of alleged racial discrimination prove he is black, it is

4  absurd to demand a victim of alleged sex discrimination based on

5  sexual orientation prove she is a lesbian.  The contrary view would

6  turn a Title IX trial into a broad inquisition into the personal

7  sexual history of the victim.  Such an approach should be precluded

8  as not only highly inflammatory and offensive, but also irrelevant

9  for the purposes of the Title IX discrimination analysis.

10      Therefore, the Court finds that sexual orientation

11  discrimination is a form of sex or gender discrimination, and that

12  the "actual" orientation of the victim is irrelevant.  It is

13  impossible to categorically separate "sexual orientation

14  discrimination" from discrimination on the basis of sex or from

15  gender stereotypes; to do so would result in a false choice.

16  Simply put, to allege discrimination on the basis of sexuality is

17  to state a Title IX claim on the basis of sex or gender.

18                  **2.  Gender Stereotype Discrimination**

19      It is undisputed that Title IX forbids discrimination on the

20  basis of gender stereotypes.  Gender stereotyping is a concept that

21  sweeps broadly.  See <u>Price Waterhouse</u>, 490 U.S. at 251 ("[W]e are

22  beyond the day when an employer could evaluate employees by

23  assuming or insisting that they matched the stereotype associated

24  with their group, for '[i]n forbidding employers to discriminate

25  against individuals because of their sex, Congress intended to

26  strike at the entire spectrum of disparate treatment of men and

27  women resulting from sex stereotypes.'") (quoting <u>Los Angeles Dep't</u>

28  <u>of Water & Power v. Manhart</u>, 435 U.S. 702, 707 n.13 (1978)).  As

discussed above, discrimination based on gender stereotyping encompasses sexual orientation discrimination.

Plaintiffs allege here that they were discriminated against because of the Pepperdine women's basketball staff's belief that Plaintiffs were lesbian.  Plaintiffs also allege that the staff's stereotypes about lesbians and lesbianism formed the basis of the staff's harassment.  (TAC ¶ 19.)

The type of sexual orientation discrimination Plaintiffs allege falls under the broader umbrella of gender stereotype discrimination.  Stereotypes about lesbianism, and sexuality in general, stem from a person's views about the proper roles of men and women – and the relationships between them.  Discrimination based on a perceived failure to conform to a stereotype constitutes actionable discrimination under Title IX.  See Centola, 183 F. Supp. 2d at 410 ("Conceivably, a plaintiff who is perceived by his harassers as stereotypically masculine in every way except for his actual or perceived sexual orientation could maintain a Title VII cause of action alleging sexual harassment because of his sex due to his failure to conform with sexual stereotypes about what 'real' men do or don't do.").

Here, Plaintiffs allege that they were repeatedly harassed and treated differently from other similarly situated individuals because of their perceived sexual orientation.  Coaches, trainers, and support staff repeatedly queried Plaintiffs about their sexual orientation, their private sexual behavior, and their dating lives. Plaintiffs allege that they were told lesbianism would not be tolerated on the women's basketball team.  Plaintiffs further allege that they were not cleared to play basketball because of

1  Pepperdine's discriminatory views against lesbianism.  If the

2  women's basketball staff in this case had a negative view of

3  lesbians based on lesbians' perceived failure to conform to the

4  staff's views of acceptable female behavior, actions taken on the

5  basis of these negative biases would constitute gender stereotype

6  discrimination.  Consequently, Plaintiffs have stated a claim for

7  discrimination because they allege that Pepperdine treated them

8  differently due to their perceived lack of conformity with gender

9  stereotypes, and further that Pepperdine discriminated against them

10  based on stereotypes about lesbianism.

11          **3.  Sex Discrimination**

12      In addition to stating a claim based on gender stereotyping

13  discrimination, Plaintiffs have stated a claim that they were

14  discriminated against because of their sex.  Discrimination on the

15  basis of sex can be defined as treating someone differently simply

16  because that person's sex is different from a similarly situated

17  person of the opposite sex.  See Manhart, 435 U.S. at 711 (applying

18  the "simple test of whether the evidence shows treatment of a

19  person in a manner which but for that person's sex would be

20  different" (internal quotation marks omitted)); Oncale, 523 U.S. at

21  80 (describing the "critical issue" under Title VII as whether the

22  discrimination would have occurred if the sex of the victim had

23  been different).

24      Here, Plaintiffs allege that they were told that "lesbianism"

25  would not be tolerated on the team.  If Plaintiffs had been males

26  dating females, instead of females dating females, they would not

27  have been subjected to the alleged different treatment.  Plaintiffs

28  have stated a straightforward claim of sex discrimination under

1  Title IX.  <u>Cf.</u> <u>Latta v. Otter</u>, 771 F.3d 456, 480 (9th Cir.

2  2014)(Berzon, J., concurring)(finding same-sex marriage bans were

3  facially discriminatory on the basis of sex because the bans

4  dictated who could marry who based on the sex of the marriage

5  participants).

6       This Court's conclusion is in line with a recent Equal

7  Employment Opportunity Commission ("EEOC") decision holding that

8  sexual orientation discrimination is covered under Title VII, and

9  therefore that the EEOC will treat sexual orientation

10 discrimination claims the same as other sex discrimination claims

11 under Title VII.  <u>Baldwin v. Anthony Foxx, Sec'y, Dep't of Transp.</u>,

12 EEOC Appeal No. 0120133080, 2015 WL 4397641, at *10, (EEOC July 16,

13 2015) (holding that "allegations of discrimination on the basis of

14 sexual orientation necessarily state a claim of discrimination on

15 the basis of sex").  The EEOC concluded that "[a]n employee could

16 show that the sexual orientation discrimination he or she

17 experienced was sex discrimination because it involved treatment

18 that would not have occurred but for the individual's sex; because

19 it was based on the sex of the person(s) the individual associates

20 with; and/or because it was premised on the fundamental sex

21 stereotype, norm, or expectation that individuals should be

22 attracted only to those of the opposite sex."  <u>Id.</u>  For these

23 reasons, as well as for the reasons stated in this Order, this

24 Court agrees.

25      **B.  Plaintiffs' Title IX Retaliation Claim**

26      Pepperdine further argues that Plaintiffs' fifth cause of

27 action, for retaliation under Title IX, must be dismissed because

28

18

1   Plaintiffs have not alleged facts establishing a prima facie case
2   of retaliation.

3        Under Title IX, "a plaintiff who lacks direct evidence of
4   retaliation must first make out a prima facie case of retaliation
5   by showing (a) that he or she was engaged in protected activity,
6   (b) that he or she suffered an adverse action, and (c) that there
7   was a causal link between the two." Emeldi, 698 F.3d at 724.  In
8   order to make out a prima facie case, a plaintiff "need only make a
9   minimal threshold showing of retaliation."  Id.

10       Here, Plaintiffs have clearly pled a plausible claim for
11  retaliation.  Plaintiffs were engaged in protected activity.  They
12  complained to the coaching staff and Pepperdine's Title IX
13  coordinator about the harassment they suffered.  See Jackson v.
14  Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005) ("Retaliation
15  against a person because that person has complained of sex
16  discrimination is another form of intentional sex discrimination
17  encompassed by Title IX's private cause of action.").  Furthermore,
18  Plaintiffs allege various retaliatory actions they experienced as a
19  result of their complaints. (See, e.g., TAC ¶¶ 34-36, 63-69.)
20  They allege that, ultimately, they were forced off the basketball
21  team and lost their scholarships.

22       Pepperdine argues that because Plaintiffs tried to hide their
23  relationship status, they therefore never could have made a
24  complaint about discrimination.  This argument is without merit.
25  Plaintiffs clearly allege that they complained to the coaching
26  staff and school officials about the intrusive questioning and
27  harassment to which they were subjected.  The fact that Plaintiffs
28  may never have explicitly told school officials that they were

1  dating is irrelevant to whether they complained that they were

2  being harassed.  Again, requiring that Plaintiffs disclose their

3  sexual orientation or relationship status improperly focuses the

4  inquiry on the status of the victim rather than the bias of the

5  alleged harasser, and imposes a burden that Title IX does not

6  contemplate.

7      **C.  Uncertainty of Plaintiffs' Third, Fourth, and Fifth Causes
          of Action**

8

9      Pepperdine asserts that because Plaintiffs have chosen to

10  plead their Title IX theories under three separate causes of

11  action, this format renders Plaintiffs' Title IX claims "uncertain

12  and not legally cognizable."  (See MTD at 24-25.)  Pepperdine's

13  argument is unavailing in light of the liberal pleading standards

14  of Federal Rule of Civil Procedure 8.  Although Plaintiffs could

15  have pled their Title IX claims as a single cause of action, the

16  fact that they included them as three separate causes of action

17  does not require dismissal.  Under Rule 8, all that is required is

18  that the complaint must contain "a short and plain statement of the

19  claim showing that the pleader is entitled to relief."  Fed. R.

20  Civ. P. 8(a)(2).  In fact, Rule 8 expressly states that "[n]o

21  technical form is required" for pleadings, and further that "[a]

22  party may set out 2 or more statements of a claim or defense

23  alternatively or hypothetically, either in a single count or

24  defense or in separate ones."  Fed. R. Civ. P. 8(d).  Accordingly,

25  Plaintiffs' third, fourth, and fifth claims are not "legally

26  uncognizable" or "uncertain," and cannot be dismissed for such a

27  reason.

28  ///

1        **D.  Prayer for Prejudgment Interest**

2        Pepperdine also moves to dismiss Plaintiffs' prayer for

3   prejudgment interest.  Strictly speaking, Plaintiffs' request for

4   prejudgment interest is contained in their "Relief Requested"

5   rather than pled as a separate claim, and thus a motion to dismiss

6   under Rule 12(b)(6) is the improper vehicle to use in arguing

7   against prejudgment interest.  Instead, Pepperdine should have

8   moved to strike the prayer for prejudgment interest.  <u>See</u> Fed. R.

9   Civ. P. 12(f).  The Court will treat Pepperdine's motion as a

10  motion to strike with respect to the prayer for prejudgment

11  interest.

12        Plaintiffs argue that, at this stage of the proceedings,

13  because the nature of their claims remain "in flux," the Court

14  should defer ruling on the issue of prejudgment interest until a

15  later point in the case.  Plaintiffs have not responded to

16  Pepperdine's substantive arguments.

17        California Civil Code Sections 3287 and 3288 govern awards of

18  prejudgment interest.  Pepperdine contends that Plaintiffs are not

19  entitled to prejudgment interest on their state law claims because

20  the damages involved are for "the intangible, noneconomic aspects

21  of mental and emotional injury."  <u>Greater Westchester Homeowners</u>

22  <u>Assn. v. City of Los Angeles</u>, 26 Cal. 3d 86, 103 (1979).  However,

23  the damages involved in the present case may go beyond mental and

24  emotional injury.  Plaintiffs allege that, due to Pepperdine's

25  actions, Plaintiffs were forced off the women's basketball team,

26  had their scholarships revoked, and withdrew from the school.  (TAC

27  ¶¶ 76-79, 136.)  Damages from these types of injuries may be

28  tangible and economic, and thus eligible for prejudgment interest

1  under Section 3288.  Accordingly, the request for prejudgment

2  interest will not be stricken.

3  **IV.  CONCLUSION**

4      For the foregoing reasons, the Court DENIES Pepperdine's

5  motion to dismiss Plaintiffs' third, fourth, and fifth causes of

6  action and prayer for prejudgment interest.

7

8

9  IT IS SO ORDERED.

10

11

12  Dated: December 15, 2015

                                    DEAN D. PREGERSON
13                                   United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28